## CLAYTON and wife *vs.* WARDELL and others, executors, &c.

Marriage is a civil contract, and all that is essential to its validity is a *present agreement* between competent parties to take each other for husband and wife.

And the agreement may, like any other fact, be proved either by direct or circumstantial evidence.

Circumstances however, such as the cohabitation of the parties, their reception among friends, common reputation, &c. do not of themselves constitute marriage. They are evidence merely of a marriage contract, and are liable to be rebutted by other testimony.

C. was the daughter and only issue of the marriage of M. and Y. Upon a question of her legitimacy it was alledged that the marriage was void on the ground of a prior marriage of Y. the mother, with one S. who was still living. In respect to the alledged prior marriage it appeared that S. was arrested under the bastardy act as the putative father of a child with which Y. was pregnant, and entered into a recognizance to answer the charge, but no further proceedings were had. Y. was afterwards delivered of the child which lived eleven months and then died. While the child lived S. and Y. cohabited together, Y. living with her mother. It was understood among the friends of S. that they were married, and Y. was received among them as his wife. Soon after the death of the child they ceased to cohabit with each other, and an instrument was executed between them, in which they were described as husband and wife, and by which they agreed to a separation; and within a month afterwards Y. married with M. There were some other circumstances of minor importance. *Held,* that the evidence of the prior marriage was not sufficient to invalidate the marriage of Y. with M., and that C. was entitled to a legacy as the lawful issue of M.

The presumption of marriage which arises from cohabitation, it seems, is repelled by proof that the connection of the parties was illicit in its origin.

A mere presumption from circumstances in favor of a prior marriage, it seems, is at least neutralized by the presumption against the commission of crime in contracting a subsequent marriage.

On an indictment for bigamy, the prior marriage must be established by direct proof; and evidence of cohabitation, reputation, &c. is not admissible.

It seems however that such evidence is competent where the crime of bigamy only comes collaterally in question, as where the proceeding is to recover a legacy, and the right to it depends on the question of a valid prior marriage. PRATT, J. contra.

APPEAL from an order of the supreme court, reversing a decree of the surrogate of the city and county of New-York on a question of legitimacy.

George G. Messerve died in the year 1826, having made a

Clayton *v.* Wardell.

will whereby he bequeathed to Wardell and others, his [231] executors, the sum of $10,000, and a share of his residuary estate, in trust, to pay the income quarterly to his son George Messerve during life, and after his death, the principal to his lawful issue : and in case of his death without lawful issue, to pay the principal to other persons. Geo. Messerve was married in the year 1825 to Sarah Maria Youngs, and had issue of the marriage a daughter, Catharine Ann, born in the year 1828. He died in the year 1835; and his daughter Catharine Ann, in the year 1839, by her next friend, presented her petition to the surrogate of the city and county of New York, claiming to be the only lawful issue of the said George Messerve, and praying for an account against the said executors, and payment of the said sum of $10,000 to her. The executors, on being cited, appeared and contested the claim, on the ground that she was not a legitimate child of the said George. They alledged and attempted to prove that the marriage of which she was the issue was void by reason of a previous marriage of her mother with one Richard Schenck, who was living at the time of the second marriage, and the question was whether there had been such previous marriage. The surrogate decided against her legitimacy and dismissed the proceeding. She appealed to the supreme court, which, sitting in the first district, reversed the decree of the surrogate. The executors appealed to this court. A sufficient statement of the evidence bearing upon the question of the previous marriage will be found in the opinions of the judges. Pending the appeal in the supreme court, Catharine Ann married Edward Clayton. Her mother, after the death of the said George Messerve, became Mrs. Sharkey.

*C. W. Sanford,* for appellant.

*E. Sandford,* for respondents.

HARRIS, J. The sole question in this case is, whether the mother of Catharine Ann Clayton, at the time of her intermarriage with George Messerve, was, in fact, the wife of Richard

[232] Schenck.   It is not pretended that there is any proof of the solemnization of such prior marriage—nor is such proof necessary.   A valid marriage may exist without any formal solemnization.   By the ancient common law of England, marriage, being regarded as a sacrament, must, to be valid, have been celebrated *in facie ecclesiæ*.   But since the reformation, it has been regarded as a civil contract.   And like every other contract, all that is necessary for its validity is the deliberate consent of competent parties entering into *a present agreement* to take each other for husband and wife.   The policy of such a rule may, perhaps, be questionable.   The facility with which the contract may be made, where this rule exists, contrasts most singularly with its indissolubility, when made.   Indeed, in England itself, this common law rule has not existed for nearly a century.   By the marriage act of 1754, all marriages, not celebrated according to the form prescribed by that act, are declared void.   But in this state the common law rule exists; and whatever may be thought of its wisdom, the existence of the marriage contract is a fact which may be proved, like any other fact, either by positive evidence of the agreement, or by evidence from which it may be inferred.   The sanctions with which religion has, in this and every other civilized country, invested this contract, are not a matter of civil cognizance.   The only difference between a marriage celebrated by a formal ceremony, and one not so celebrated, is that, in the former case, the regular celebration is conclusive evidence of the mutual consent requisite to the validity of the marriage, while in the latter it is competent to rebut the proof of the marriage by other evidence.

In the case before us, it is not claimed that there is any direct evidence of actual marriage.   For the want of such proof recouse has been had to secondary and presumptive evidence.   It is attempted to establish the marriage between Schenck and the mother of Mrs. Clayton by evidence of cohabitation; of acknowledgment of a marriage; of the reception of the parties, as husband and wife, by their relatives and friends; and by proof of common reputation.

From the testimony introduced for this purpose I think the

following facts appear: that Schenck, being the reputed [233] father of a child with which Sarah Maria Youngs, the mother of Mrs. Clayton, had become pregnant, was, on the 22d of November, 1822, arrested as such putative father, under the provisions of the bastardy act, and entered into the usual recognizance to answer to the charge, and that no further proceedings were ever had thereon; that in the early part of May, 1823, Sarah Maria was delivered of a child, which lived about eleven months, and then died; that after the birth of the child, and while it lived, Schenck, for some part of the time at least, cohabited with Sarah Maria, who lived with her mother; that it was understood, among the relatives and friends of Schenck, that they were married, and Sarah Maria was received by them as his wife, and the child as his child; that very soon after the death of the child, as early at least as the summer following, Schenck ceased to cohabit with Sarah Maria, and in June, 1825, an instrument was executed between them, in which they are described as husband and wife, and by which they mutually agreed to a separation. This instrument purports to have been executed by Schenck and Sarah Maria his wife, and also by Joseph List, as the friend of Sarah Maria, who covenanted to indemnify Schenck against any liabilities on her account. In respect to this instrument it may be worthy of notice that it purports to have been executed by both Sarah Maria and List, by making their mark, and that Wood, the subscribing witness who was examined, testified that he had no acquaintance with the parties who executed the paper, nor sufficient recollection of them to know them if he should see them. The witness was but 15 years old at the time the instrument was executed. The hand-writing of Sylvanus Mott, the other subscribing witness, was proved, and it was also proved that he was dead. The instrument, the day after it was executed, was left by Schenck with his sister, for preservation.

The principal witnesses relied upon to establish the marriage were Mrs. King and Ida Schenck, both sisters of Schenck. The other testimony on the same side is chiefly upon the question of reputation. Mrs. King and Ida Schenck lived together. The

[234] former testified that she first heard of the marriage of her brother at the funeral of another brother, which was on the 22d of February, 1823.; that when the child was two or three months old, her brother and his wife came to her house and brought the child with them. This was the first time she had seen her brother's wife, and until then she did not know that her brother lived with Sarah Maria at her mother's. It does not appear that Schenck ever paid any thing for the board of himself, or his wife, or that he ever in any way contributed to her support. On the contrary, it is proved that as well after the birth of the child as before, the alledged wife supported herself, by making segars; that when the child was a few weeks old Mrs. List, the mother's sister, took the child to church and had it christened; and that when it died her husband paid its funeral expenses. Two sisters of Sarah Maria, and John Watson and his wife, also relatives of the family, all testify that they never heard her called by any other name than that of Youngs before her marriage with Messerve. This marriage took place within a month of the time when the articles of separation are alledged to have been executed. She was married by the name of Sarah Maria Youngs. At the time of this marriage she was but sixteen or seventeen years old. .

These are the principal facts and circumstances in the case, and the question is, whether they warrant the legal presumption of a marriage between Schenck and Sarah Maria Youngs.

It was insisted upon the argument that, as the effect of establishing the marriage with Schenck, must be to prove the mother of Mrs. Clayton guilty of the crime of bigamy, such marriage can only be established by direct proof. But I am not prepared to concur in this position. I know it has been said, that upon a charge of bigamy, a marriage in fact, as distinguished from the acknowledgment and cohabitation of the parties must be proved. (*Morris* v. *Miller*, 4 *Burr.* 2057; *Fenton* v. *Reed*, 4 *John.* 52; *The People* v. *Humphrey*, 7 *id.* 314; *The State* v. *Roswell*, 6 *Cowen*, 446.) But this rule, even in the case of bigamy, is far from being well established. What weight the [235] evidence of the admission and acts of the party accused

Clayton *v.* Wardell.

is to have in establishing the fact of a marriage, must depend very much, of course, upon the peculiar circumstances of the case. But I am unable to see why it should be necessary to prove the first marriage by eye-witnesses of the ceremony, or those who heard the marriage agreement. In every other case, the acts and admissions of a party, even though he be accused of a capital offence, are evidence against him. It is not easy to say why such evidence should not be received to prove a marriage. What weight the evidence should be allowed to have, is quite a different question. It may not be sufficient to warrant a conviction, but upon principle, it must be regarded as competent. It should be received for what it is worth.

But the more important question in this case is, whether conceding the proof to be competent, it is sufficient to establish the first marriage. Upon the most mature consideration, I have come to the conclusion that it is not. The period during which it is pretended the parties cohabited was very short. The circumstances of that cohabitation, are such as to afford but a slight presumption of marriage. The intercourse between the parties was in its commencement meretricious, and there is perhaps as much reason to believe that their subsequent connection was of the same character as that a marriage had in fact taken place. The legal presumption of marriage arising from mere cohabitation is, at least, weakened by the circumstances under which their connection had its origin. The inference that a marriage must have taken place after the arrest of Schenck is, I think, overcome by the fact, that none of the relatives of either of the parties, although several were examined as witnesses on each side, have mentioned when or where, or by whom, they were supposed to have been married. Mrs. King, a sister of Schenck, whose testimony is perhaps more definite than that of any other witness, never heard of it until more than three months after the arrest; and although residing in the same neighborhood, she never saw the alledged wife of her brother or heard he was living with her, until the summer of 1823. The most that can be said of the conduct of the parties, during the year they are said to have cohabited, (for [236]

there is no evidence that their connection continued beyond that period,) is that it was equivocal. It may be accounted for quite as well upon the theory of a meretricious union, as of an actual marriage.

The reputation of their marriage seems also to have been divided. The friends of Schenck seem to have understood that they were married. On the contrary, the connection seems to have been regarded by the friends of the alledged wife as disreputable. Schenck does not appear to have been received, or treated by them as her husband ; and besides, mere reputation, when admissible at all, is always to be regarded as the weakest kind of evidence. It is never conclusive, except when it is general, and supported by other circumstances. " When the connection was at first notoriously illicit," said Lord Eldon in *Cunningham* v. *Cunningham*, (2 *Dow. P. C.* 482,) " and a change in the character of the connection must be operated, and the means employed for that purpose are such as to leave half the world in doubt ; the relations, one half thinking one way, the other half the other ; at what time, in what circle could it be said that there was such a habit and repute as raised the presumption that the parties had mutually consented to be husband and wife ? He could not admit that mere cohabitation, as man and woman, was a cohabitation as husband and wife." In this case, the presumption in favor of the legality of the connection is rebutted by the fact, that it was at first illicit. The presumption then was, that having been illicit in its origin, it was likely to continue so. If it was subsequently changed, at what time did it become lawful ? There must have been a time when the transition took place. If there was a marriage, no one pretends to know when, or even about when, it occurred. Two sisters of each of the parties, of mature age at the time, and living in the vicinity, have been examined as witnesses, and yet not one of them assumes to say when they began to live together as man and wife. It has been supposed that this new relation was formed about the time of the arrest under the bastardy act. The conjecture may have probability, but certainly has no evidence to support it.

Much stress is laid upon the fact that the parties exe- [237] cuted articles of separation. I admit there is something singular, and so far as the evidence goes, unaccountable, in this transaction. The parties had in fact separated shortly after the death of their child. It does not appear that they had any intercourse with each other after that time; and yet, a year afterwards, an instrument purports to have been executed, by which the brother-in-law of the alledged wife becomes bound to protect Schenck against liability on her account. By whom, or at whose instance it was prepared, does not appear. If it was in fact executed by the parties by whom it purports to have been executed, about which there certainly is some room for doubt, why indemnify Schenck? why execute it at all? These, and other like inquiries, naturally suggest themselves, in the endeavor to ascertain the true relation of the parties. But as no answer is furnished by the case, I I can not regard the mere naked fact of the execution of the paper by the alledged wife, under the circumstances as they appear, as furnishing evidence sufficient to justify the inference of a marriage.

And then, against this circumstantial evidence, unsatisfactory and inconclusive as it is in itself, is opposed the strong legal presumption against the commission of crime: a presumption applicable in every case, as well civil as criminal. The value of this presumption is, I admit, somewhat diminished by the fact, that to give it effect, the party in whose behalf it is applied must be left involved in the disgrace of a meretricious connection with Schenck. On the other hand, we know that this was the character of that connection in its origin. The presumption that such connection would be likely to continue, is, at least, equal to the presumption in favor of a subsequent marriage. The most that can be said upon this point is, that there is a conflict of presumptions; and in such a case the rule is, that that must yield which has the least degree of probability to sustain it. Thus, in *Rex* v. *Twyning*, (2 *B. & A.* 386,) a wife, within a year after her husband had left the country, married a second time. Here was a presumption, on the one hand, of the continuance of the first husband's life, and, on the other, the

[238] presumption that the wife would not commit the crime of bigamy. The latter presumption was allowed to prevail, and that, too, in a case involving merely a question of settlement. (*See also Greensboro'* v. *Underhill,* 12 *Verm.* 64 ; 1 *Greenl. Ev.* § 35 ; *Math. on Presump. Ev.* 27.)

Upon the whole, this is my conclusion. George Messerve, the father of Mrs. Clayton, was publicly and by a formal religious ceremony, married to Sarah Maria Youngs, on the 3d of July, 1825. Mrs. Clayton is the issue of that marriage. The burden of proving that, at the time of the intermarriage of her parents, her mother was the wife of Schenck, rests upon those who deny her legitimacy. In my opinion, the proof is not sufficient to establish such prior marriage. The decree of the supreme court should, therefore, be affirmed.

RUGGLES, HURLBUT and TAYLOR, Js. concurred.

PRATT, J. It must be deemed settled law in this state that the contract of marriage is simply a civil contract, differing from other contracts only in this, that it can not be rescinded at the will of the parties. It may be consummated by agreement *per verba de presenti,* without the presence of a magistrate or a clergyman, or the sanction of the church ; but I can not assent to the proposition that an executory contract to marry at a future time, followed by cohabitation, will of itself constitute matrimony. It may be evidence in connection with other circumstances, from which a marriage in fact might be inferred. But in all cases, in order to establish that most sacred and honorable relation of husband and wife, there must have been entered into by the parties, an actual executed contract of present marriage.

But the great question in this case does not relate to the forms and ceremonies necessary to be observed to create the relation, but to the evidence necessary to establish the fact that the relation has been created in any form. For many purposes a marriage may be proved by evidence that the parties cohabited together as man and wife, held themselves out to the world as

Clayton *v.* Wardell.

such, and were received among their neighbors and friends [239] as holding that relation to each other. In the absence of any conflicting circumstances, such proof is often entirely satisfactory. Indeed, the law always presumes against the commission of acts involving moral turpitude in the actors. A life of illicit cohabitation involves the parties in a moral turpitude which in all civilized societies have excluded them from all intercourse with respectable people. And as the marriage of two persons is usually attended with some publicity, and if not in the first instance known to the community generally where the parties reside, is at least usually known to the families of the parties, and through them eventually made public, the fact that they are admitted into respectable society, raises a strong presumption in favor of the purity of the relation that exists between them. But whilst cohabitation as man and wife attended with the other circumstances referred to is evidence tending to show that a contract of marriage has at some time been consummated between the parties, it does not in itself constitute matrimony, nor afford conclusive evidence of the fact. Instances of illicit cohabitation occasionally occur in all communities, and the fact that it is esteemed so disgraceful to the guilty parties, presents a strong inducement on their part to endeavor to escape the odium, by assuming that the relation is sanctioned by marriage. Hence while upon questions of pedigree this circumstantial evidence has been held competent, in other cases it has been entirely rejected. Thus on trials for bigamy and civil actions for criminal conversation it has always been excluded, the courts holding in such cases that the marriage must be proved by direct evidence. There are other cases again, to which I shall have occasion to refer, and in which, whilst this evidence has been admitted, it has been held insufficient to overcome contrary presumptions growing out of other circumstances in the cases. It becomes necessary, therefore, to inquire into the reasons for this exclusion of evidence, which under some circumstances is deemed competent, and the principles upon which it is based.

As I have before observed, cohabitation attended with the other facts are merely circumstances from which marriage [240]

in fact may be presumed; but where facts are proved from which contrary presumptions arise, the former evidence fails, or at least is neutralized. It is said by a recent able writer to be "*presumptio juris* running through the whole law of England, that no person shall in the absence of criminative proof be supposed to have committed any violation of the criminal law, whether *malum prohibitum* or *malum in se*, or even done any act involving a civil penalty, such as a loss of dower, &c. And this presumption is not confined to proceedings instituted with a view of punishing the supposed offence, but holds in all civil suits where it comes collaterally in question." (*Best on Presumptive Ev.* 64, 65.) It is, I think, upon this principle that in such cases this evidence is excluded. Upon the trial upon an indictment for bigamy, the presumption against the commission of the crime stands opposed to the presumption against illicit intercourse, or that arising out of the circumstances which in a different case might be sufficient evidence of marriage. Between these presumptions courts of justice will not decide. On the trial of a civil action for *crim. con.* the same principle is applied. The action is penal in its nature. The damages given are not only compensatory but are often exemplary, graduated as a punishment upon the defendant for the outrage he has committed upon the general peace and good order of society. The act, therefore, for which the defendant is tried involves in its nature a civil penalty, and the presumption against its commission stands opposed to the presumption growing out of the circumstantial evidence before referred to. It is true, that in actions of this kind, there are other principles involved in the exclusion of this kind of testimony. The plaintiff, if an actual marriage exists, has it in his power generally to prove it. He knows who were present, and, therefore, should be compelled to adduce the best evidence—a principle which I may have occasion to apply to another aspect of the case.

These principles growing out of the presumption of innocence, [241] have by no means been confined in their application to the two cases which I have been considering, but have uniformly been extended to all cases calling for their application. Thus

Clayton *v.* Wardell.

in the case of *The King* v. *The Inhabitants of Twining*, (2 *Barn. & Ald.*, 386,) the same principle was applied. The case involved simply the settlement of a pauper. A woman had been married to a soldier who soon after left for the East Indies. Within twelve months the woman married again, and the question turned on the validity of the second marriage. It was held, that the death of the first husband before the second marriage might be presumed and the latter was valid. Bailey, J. deemed it a case of conflicting presumptions—the presumption of the continuance of life being balanced by the presumption against the commission of crime.

The same rule has also been applied in a civil action for libel where the defendant had charged the plaintiff with the crime of bigamy, and attempted to justify by proving the truth of the charge. (*Weimath* v. *Harmer*, 8 *Carr. & Payne*, 695.) The court held that the alledged former marriage must be proved by direct evidence, and the circumstantial evidence admitted in ordinary cases was rejected. So also in a suit of jactitation of marriage. (2 *Wm. Bl.* 877.)

In this country, the same rule has been applied. In Connecticut it has been applied on a trial for incest. (*State* v. *Roosevelt*, 8 *Conn.* 448.) In Maine, upon the trial of an indictment for adultery, (*State* v. *Hodgskin*, 19 *Maine*, 155,) and for a libel for divorce in Massachusetts. (*Ellis* v. *Ellis*, 11 *Mass.* 92.) Now these adjudications clearly show that the exclusion of evidence of cohabitation in proving a marriage in cases of bigamy is not an arbitrary exception to a general rule, but it is simply the application of general principles to a case which calls for their application, and should be extended to all cases of a like character. (*See* 13 *Mees. & W.* 260; 3 *East*, 198; 12 *Verm.* 604.) If, therefore, the same application of a general principle shall be denied to the case at bar, it may indeed be deemed an exception to the general rule. Why should this case be excepted from the application of this rule? The petitioner proved beyond cavil a marriage in fact between her father and mother, and [242] that she was the issue of such marriage. Her mother was married by her maiden name. The executors insist that the mother

had been previously married to one Schenck, and attempt to prove it by circumstances. If they succeed, they prove the mother guilty of the crime of bigamy, and bastardize the petitioner. Why should not as conclusive proof and as high a grade of evidence be required as would be required of the executors if they were attempting to justify in an action of slander brought against them by the mother for charging her with the crime of bigamy? The circumstances proved in this case would be sufficient, in the absence of conflicting circumstances, to raise a presumption in favor of a marriage with Schenck; but when an actual marriage is proved with Messerve, this presumption is overthrown.

Cases that have arisen in the admission of ancient documents without direct proof of their execution are very apposite to this case. By proving that a deed or other paper upon which the title in dispute may depend is over thirty years old, together with other circumstances not necessary to enumerate, a presumption of its genuineness arises and the court will allow it to be read in evidence without direct proof of its execution. But if it be proved that subsequently to the date of the assumed deed or instrument the supposed grantor actually executed and delivered a deed of the same premises to another grantee, the circumstantial proof of the former deed will be rejected, and direct proof of its execution will be required. A subsequent conveyance of the land previously conveyed would be a gross fraud, and hence the presumption against the commission of a fraud will, at least, neutralize the presumption arising from the circumstances in favor of the genuineness of the former deed, and exclude it from being received in evidence as an ancient deed. (*Gilbert's Ev.* 102; *Gresl. Eq. Ev.* 124; 4 *Denio,* 201.) In this case the second marriage would be a crime of the grade of felony and hence it raises a still stronger presumption. I am satisfied, therefore, upon this point alone, that the decision of the surrogate was erroneous. But I concur in the conclusions to which my brother Harris has come upon the other points in [243] the case and am, therefore, in favor of affirming the decision of the supreme court.

Clayton *v.* Wardell.

GARDINER, J. (disenting.) In this case, Mrs. Clayton makes title to the legacy in question, as the only lawful child of George Messerve. She is bound to prove affirmatively a legal marriage between her father and Sarah Maria Young, her mother. She would have the unquestioned right to establish this by proof of the declarations, cohabitation, and the reputation prevailing in the family, and among the friends of the parties. And I see no reason why her claim may not be resisted by evidence of a similar character.

The general principle deducible from the cases would seem to be this : That where the *object* of the testimony, was to show a party guilty of a crime, or of an offence in the nature of a crime, evidence of the same character and strength must be produced, that would be necessary upon a indictment. Thus on a charge of bigamy or adultery, the relation of husband and wife, the violation of which, in either case, constituted the guilt of the accused, must be established by record evidence when it exists, or at least by the testimony of witnesses, present at the marriage. Nothing short of this will answer the purpose. (*Morris* v. *Miller,* 4 *Burr.* 2057 ; *Commonwealth* v. *Littlejohn,* 15 *Mass.* 163 ; *State* v. *Hodgskins,* 11 *Maine R.* 155 ; *People* v. *Humphrey,* 7 *John.* 314 ; *Regina* v. *Millis,* 10 *Clark & Finn.* 534 ; *Catherwood* v. *Caslon,* 13 *Mees. & Wels.* 261.) Whatever may be the rule now in England, with us, marriage has always been considered as a civil contract, which if made *per verba in presenti,* without cohabitation, is valid. (2 *Kent,* 87, *and notes ;* 13 *Com. L. R.* 266, *note.*) The law of our state exhibits, therefore, the singular anomaly of recognizing the validity of a marriage, entered into by the consent of the parties, without witnesses, and yet requiring their testimony to a marriage in fact, in all criminal or quasi criminal prosecutions, or actions founded upon that relation. The rule, however, neither in England or in this country, extends to cases merely involving rights to property. (*Wilkinson* v. *Payne,* 4 *T. R.* 470 ; [244] *Burt* v. *Barlow, Doug. Rep.* 166 ; *Devereaux* v. *Much Dew Church,* 1 *W. Bl.* 367 *and note ;* 2 *Kent,* 87 ; *Reed v. Fenton,* 4 *John.* 52, *Jackson* v. *Winne,* 7 *Wend.* 50.)

This suit was not instituted in behalf of Mrs. Clayton, for the purpose of establishing the guilt or innocence of her parents, but to recover a sum of money. As a part of her title she proves a marriage between Messerve and her mother on the 3d day of July, 1825. The defendants, who were executors, with a view to protect the estate of their testator against this demand of the daughter, affirm, and she denies, that her mother was previously married to Schenck, who was living at the period above mentioned. The effect of this evidence upon the reputation of Mrs. Sharkey, is incidental ; and guilt upon her part, if made out, is the result of facts, proved not by one, but both of the parties, for an entirely different object. It seems to me that neither of these litigants are entitled to treat these collateral results as the main issue in the cause, and to call upon the other to overcome presumptions of innocence, which would be pertinent if Mrs. Sharkey were on trial for a criminal offence. There is a wide distinction between bigamy and a common law contract.

Undoubtedly the petitioner can claim, to some extent, the benefit of presumption in favor of her mother's innocence. So can the opposite party ; and between the moral guilt of prostitution, continued under the roof of her mother, under the circumstances disclosed by the evidence, and that of bigamy, there is very little to choose. Most females with any pretension to character, would consider the imputation of the former offence quite as degrading as the latter. (1 *Hill*, 272.)

Indeed, the only presumption that will exonerate Mrs. Sharkey from gross moral delinquency, is that she and her first husband supposed that the deed of separation, executed on the 3d of June, 1825, authorized her to contract a second marriage. The supposition is not an uncommon one, by persons in their condition, and might be honestly entertained by a woman whose education was not sufficient to enable her to write her own name.

[245] I shall not recapitulate the testimony. In addition to the usual evidence of cohabitation, acknowledgment, reception by the family, and friends of the parties, we have the indenture to which I have referred, executed by both parties, and the trus-

Clayton *v.* Wardell.

tee of the female. That recites unhappy differences between Schenck, the *husband*, and Sarah Maria, *his wife*, and contains a stipulation that the *wife* may live separate from the husband, and that he will not compel her ever thereafter, to cohabit with him, nor molest or disturb her property, or person in any wise whatever. If an instrument of this kind, containing the distinct and unqualified admission of both parties, that they were *at the time* husband and wife, and the sole object of which was to modify that relation as an *existing one*, is not evidence from which marriage in fact can be inferred, no such evidence short of the proof of witnesses present at the ceremony can be given.

It is now said, that the evidence of the identity of the parties is insufficient. Wood, one of the subscribing witnesses, who drew the article, says he saw the *parties* to it execute it. That he saw them several days at the office before the execution of the paper. He had no acquaintance with them previously, nor should he now know them, (17 years after the transaction,) if he saw them. This is entirely consistent with the fact that he knew them to be the parties at the *time* of his subscription, after "several days' acquaintance and conversation with them, upon the subject of their difficulties." But Mott, the other witness, was the nephew of the employer of Schenck, and was unquestionably acquainted with all the parties, and made a witness for that reason. He was dead, but his signature was proved, and was alone sufficient to establish the execution of the deed, and the identity of the parties. (*Phil. Ev.; Cowen and Hill*, 2d *ed. vol.* 1, 473, *and part* 2, *pp.* 1300, 1301, *and cases.*) In addition, it was proved, that the trustee of Mrs. Sharkey was her brother-in-law, and that the deed, when executed, was deposited with the sister of Schenck for safe-keeping. This objection was taken before the surrogate, after Wood had testified; but it was not renewed when the subsequent evidence was given. It is not noticed by the surrogate, or the supreme court, and is [246] unworthy of serious consideration anywhere. The surrogate who heard the witnesses testify, and whose situation was more favorable than any court of review for judging of their credibility,

was satisfied of the existence of the first marriage, and has decided accordingly.

I think we cannot overrule his decision, without adopting the doctrine that in suits for a money demand, a marriage in fact can not be invalidated by any evidence, however strong, of a prior contract of the same kind, which would be insufficient to produce a conviction upon an indictment for bigamy. I prefer the law as it is. If there is any change it should be, as I think, by repudiating the distinction between the kinds of evidence requisite to establish a contract of marriage in civil suits, and in criminal or quasi criminal proceedings. The distinction was established by Lord Mansfield, and has been adopted without question or investigation apparently. There never has been a reason assigned for it, which if followed out, would not uproot the whole doctrine of presumptive evidence, as applicable to criminal prosecutions.

I think the judgment of the surrogate should be affirmed, and that of the supreme court reversed.

BRONSON, C. J. and JEWETT, J. concurred in the opinion delivered by Judge GARDINER.

And thereupon the judgment of the supreme court was affirmed.