Judicial accounting by Julia Ann Curley, administratrix of the
estate of Rensselaer Rawson, deceased, and application for a decree
of distribution, in which certain alleged grandchildren of a deceased
son of the intestate intervene, the claims of which the administra-
trix and others contested on the ground that such son was not
the son of the intestate, and that, if he was, he was illegitimate.
Decree in favor of the administratrix.

   Eugene Bryan and William J. Roche, for administratrix.

   Bunn & Luce (Lansing & Holmes, of counsel), for Marianda L.
Gager, niece.

   E. W. Douglas and C. S. McChesney, for Lorenzo D. Rawson and
others, nephews and nieces.

   A. B. Steele and Myron G. Bronner (H. Judd Ward, of counsel),
for contestants, alleged grandchildren of deceased.

   COMSTOCK, S. This case, in most of its features, is an excep-
tional one. It relates to events which happened, or which it is

claimed happened, in the year 1831,—nearly 70 years ago,—and involves a determination whether a child was born to deceased about that time, and, if so, whether it was legitimate or illegitimate. Although the paternity of the child has not been conceded, still, the principal subject of controversy in this protracted trial has been the relation which deceased and the mother bore to each other at the time of its birth. Was such relation matrimonial or or not? The principal actors are dead. The minister who it is claimed performed the ceremony, as well as the witnesses thereto, if any there were, are dead. No marriage certificate was ever given, or any record kept; so that the parties to this controversy who claim that such a ceremony was in fact performed have of necessity availed themselves of the rule which permits hearsay evidence in such cases as to family repute and understanding, and of the declarations, within certain limits, of members of the family who are dead. Many venerable witnesses have been produced, for and against, who have gone back to their early childhood days, and have told what they claimed to have seen and heard, the recollection of which they have carried through this long period, the measure of human life. Nearly 80 witnesses have been sworn, giving over 1,800 pages of evidence; and of this array, although there is much hesitancy in saying that any witness has uttered a deliberate and intentional untruth, yet a careful reading of the testimony forces the conclusion that in some instances a most phenomenal memory has been shown, which is to be attributed probably to the pride and ambition quite often manifested by very old people to show a stronger and better memory than others of events long since past, and thus recall things which in fact never existed. The leading and controlling facts are as follows:

Rensselaer Rawson, the deceased, was born in the town of Lansingburg, in this county, on the 6th day of July, 1813. He died intestate in the city of Troy on the 19th of December, 1896, in his eighty-fourth year. During the greater part of his life, after he attained his majority, he was a piano mover and cartman in said city; and by leading a sober and industrious life he accumulated a small fortune, which at the time of his death was wholly in personalty, and amounts to about $23,500. He was survived by no widow, having been a widower since 1885, but he left several nephews and nieces, children of his deceased brothers, John and William, who claim to be his only next of kin. This claim is disputed, however, by the children of one Rensselaer Rawson, late of the town of Remsen, in the county of Oneida, in this state, an alleged son of deceased, who insist that they are the rightful next of kin as grandchildren. The nephews and nieces, while they do not question the paternity of the last-mentioned parties, whom for convenience I will denominate "contestants," deny first that their father was the son of deceased; and, second, they allege that, if he was, he was begotten and born out of lawful wedlock and hence illegitimate. If either of these contentions be true, it, of course, is fatal to contestants' claim. While the latter do not in so many words concede that their father was begotten illicitly, they nevertheless claim and

argue that his mother, shortly before his birth, caused proceedings
to be commenced by the poor master of the town against one
Wheeler, charging him with the fatherhood of her prospective
child, who, she alleged, was likely to be born out of wedlock, and
that when the matter came up in court she denied that it was
Wheeler, and said it was deceased, who was its father, and that
she had been coaxed by him into making the charge against
Wheeler by his representations that Wheeler would pay $100, with
which they would buy a place and get married, and that thereupon
the poor master threatened deceased, when this plot was revealed,
that, if he did not marry her, "he would put him through" for his
attempted fraud; that shortly thereafter they were married by one
Elder Cross, and went to housekeeping in a log house, and that 2 or
3 months thereafter the child was born; and that when it was
about 3 months old deceased disappeared, and was not heard from
after that by either mother or child for nearly 20 years. It will
be seen further on that this claim is not only essential to the con-
testants' case, as showing some ground, inducement, or reason for
the alleged marriage, to wit, the threat of the poor master, and
the previous promise of deceased to marry her, but is also advan-
tageous, although probably not necessary, to the other side, as
showing the illicit character of the intercourse. Hence it is that al-
though this evidence was hearsay and incompetent, except ·as to
the declarations made by the woman, it was accepted without ob-
jection, and the story was brought out, and has been discussed and
treated pro and con by counsel as though the witness had testified
to it from his own personal knowledge.

Young Rensselaer Rawson, the father of these contestants, was
born in the said town of Remsen on the 1st day of January, 1832.
Hence any marriage, to be effective, must be shown to have occurred
before that time. His mother's maiden name was Miranda Bron-
son, and she was a daughter of John Bronson. Let us for a moment
look into the early life and history of these people, and see who
they were; what their environment, education, morality, refine-
ment; what their relations socially, more especially with a view
of ascertaining whether deceased ever voluntarily promised to marry
her, or wanted her for a wife. Miranda was born in the year 1810
in the northern part of said town of Remsen, in the district called
"Ninety-Six." She was nearly 22 years of age at the time her child
was born, and deceased was between 18 and 19. The neighborhood
in which she had lived down to this time was on the confines of
the Adirondack wilderness, and was sparsely settled. The inhab-
itants, for the most part, were poor, and many lived in log houses.
Miranda's parents were without means, and she had worked out
among the neighbors since she was old enough to do so; and when
she attained womanhood she worked at spinning, weaving, and
sewing, as she could obtain work to do, and while so employed lived
in the family of her employer. For several years she seems to have
had no permanent home, but drifted about the neighborhood, living
here and there as her employment called her, and frequently worked
for her board and shelter only. Without going into minute details,

it is safe to say that before she met deceased she was honest and virtuous, but without mental or moral training, and her surroundings were not such as to develop in her any high moral sense. She is described by one of the witnesses as "weak and easily coaxed." In the year 1829 or 1830 Rensselaer Rawson, the deceased, who since old enough had worked on a farm, went from this county, which had always been his home, to the said neighborhood, to work for his brother John, who was a farmer, and also a dealer in cattle. He was a strapping fellow, 16 or 17 years old, poor, uneducated,— unable to read or write, in fact,—and in all respects, excepting age, was a fitting counterpart of Miranda. They became acquainted, as young people do in the country. It does not appear when or how. The record is wholly silent as to their relations. There are only two instances when they are shown to have been together,— once at church in the log school house, and once when he came down the road, and she was standing outside the door, and they met and walked off together. It does not appear when either of these occasions was. There is nothing to show that he was with her more than the other young fellows in the neighborhood, or that there was any matrimonial engagement or understanding between them, or, to use a significant expression, that he ever "kept company" with her. There certainly was no cohabitation, and the extent or frequency of their immoral intercourse is wholly undisclosed. In other words, there is no evidence, either direct or inferential, of any matrimonial purpose or intention on the part of either. Had he courted her, visited her frequently, sought her,—in short, paid her such attentions as love suggests and demands,—several witnesses have been called who must have known it; and yet there is no evidence upon which any such intention can be predicated, excepting the above-mentioned narration of Smith Nichols as to what the poor master told him,—that deceased promised to marry her after they got $100 from Wheeler. But, on the other hand, there is evidence that he did not love her, and did not want her; for he ran away, and she never saw or heard from him for 20 years. The learned counsel for the contestants say that he ran away about 6 months after a marriage ceremony had been performed. There is no pretense, however, that he ever lived with her before the child was born; and the fact of his early abandonment of his wife, if she were such, is very strong proof that he did not want her or care for her. Their relations were wholly immoral, and lacking even in the mitigating feature of a pure sentiment. It is not difficult to understand how a man, although not loving the woman he has got in trouble, may come to her rescue and marry her to save her reputation or the legitimacy of his offspring; but such a course demands the exercise of a higher moral sense, and the possession of a more sterling manhood, than this young man then had. She was older than he, and he may have blamed her more than he did himself. He was concerned more by fear than love. And that this is so, and that he was unscrupulous as well as crafty and shrewd, is evidenced by the proceedings against Wheeler, of which, in the nature of things, he must have known beforehand, and which were probably

to shield him, and not to extort money so he could marry. If he had wanted her for his wife, he could have married her before the proceeding. There was nothing to prevent. This much as to his loving this woman; as to his desire to make her his wife; as to his having married her, or promised to marry her, as his own free and voluntary act. However, along about the middle of the year 1831 her delicate condition became apparent. She was then living at the house of Smith Nichols' father, and she was told that she must leave. She accordingly went to her brother John's, and remained there until about October, when she, her mother, and her sister Betsey took possession of a log house in the neighborhood, and on January 1st following she gave birth to this child. Now, if he did not love this woman or want her for his wife, and did not marry her voluntarily, it, of course, follows that, if he did marry her at all, it was against his will; and contestants here say that it was because of the poor master's threat. But why marry her under compulsion? A man never does that if he can possibly avoid it. He had no ties to bind him to this place. His brother John, he says, treated him like a dog. He had his liberty. Why not run away and go back to his old home, and leave all this trouble behind him? As we have seen, he was not troubled by scruples, and was shrewd. It is undisputed that he did run away and come back to this county; and, as we shall see, he did so without ever cohabiting or living with her, either before or after this alleged marriage, both of which facts go to show how much he wanted her. Can it be that he wanted to marry her before he ran away?

This child, having been the product of an illicit connection, is presumed to have been illegitimate; for an intercourse not matrimonial, but immoral, in its origin or inception, is presumed to so continue, until the contrary is established. The presumption of legitimacy proceeds from the charitable disposition of the law, in the absence of other evidence, to assume that the relation was moral rather than immoral; but where the contrary appears the foundation for the presumption falls. Clayton v. Wardell, 4 N. Y. 230; Brinkley v. Brinkley, 50 N. Y. 184; Badger v. Badger, 88 N. Y. 546; Gall v. Gall, 114 N. Y. 109, 21 N. E. 106. Hence the burden is on those claiming under him to show that he was born in wedlock, and, there being no reliable evidence of cohabitation or recognition of one another as husband and wife, the requirements of the law can be satisfied only by showing a ceremonial marriage. This the contestants have undertaken to do by witnesses who have testified to hearing declarations of members of the family, now deceased, as to a marriage, and the general repute and understanding in the family that these parties were married. Without going into a detailed recital of this evidence, one cannot read it without realizing its unsatisfactory character. It is meager, vague, and indefinite. There is nothing to indicate when it occurred, or where it took place, or who was present, excepting the contracting parties and the minister. There is no pretense of any declaration of any one who was present, and thus had any personal knowledge of the ceremony, excepting Miranda herself and Elder Cross; and, as to the

latter, he seems to have merely acquiesced in the statement made by another, in a general family conversation, nearly 30 years after the alleged time of the ceremony; and he was then a very old man, and in a feeble mental condition. It consists largely of declarations of Miranda herself, made some years after the alleged event, and either while she was being courted by David Yates, or after she had married him and was bringing up children by him. Mrs. Bennett and her two brothers, John and W. W. Cross, children of Miranda's sister Philinda, who married a son of Elder Cross, say that upon one occasion Miranda was visiting at some of their houses in Steuben county, many years after she had married Yates, and when her daughter Sarah, now Sarah Reno, was about 17 years of age, which would make it about 1859. They each tell substantially the same story, viz.: That Grandfather and Grandmother Cross and Miranda were present, and that they were talking about a couple that the elder had married who had not lived together but one day, and Grandmother Cross was bantering the elder that he did not have good success in the marriage ceremonies he performed. She said: "You remember when you married Miranda and Rawson?" And he said: "Yes; but when I married them I calculated that they were going to live together. If they didn't, I wasn't to blame for it." Mrs. Halstead, who was born in November, 1827, and was a daughter of Miranda's brother John, says that she heard her father and mother talk about Miranda and deceased. On her direct examination she says that a peddler was courting Miranda, and that she heard her father say that he would have to get a divorce from deceased for her; that the talk in the family was that they were married, and that he did not run away until afterwards; and that witness never heard anything to the contrary. On her cross-examination she says that the first talk she ever heard between her father and mother was when the child was about 8 years old (that would be in 1839), and that Yates was at the time courting Miranda, and that she heard her sister Abby and her brother Levi say that they were married, but that this was later on. And in narrating these declarations while on her cross-examination she leaves out what was said about a divorce. There is no doubt of the good faith of this witness, and that she said nothing she did not fully believe to be true; and it is not improbable that she did hear substantially what she has testified to, excepting as to the divorce. Her brother Albert, who is 8 years older, and who lived at home at the time, a member of the same household, tells a very different story, which will be reviewed later on. Other witnesses have given evidence of substantially the same kind, but it is all justly open to criticism, either as founded on Miranda's assertion, or that the declarations were made at about the time of her marriage to Yates, or later, when her daughters were old enough to understand, made in charity by her relatives to cover up and conceal her past error.

Hearsay evidence, because of its inherent weakness and unreliability, is, as a general rule, excluded, and it is only in extreme cases of necessity that its admission is permitted at all. It is to

be doubted whether much, if any, weight should be attached to it, when the witnesses attempt to repeat conversations which occurred nearly 70 years ago, and when they were small children of 12 or 13 years of age. Judge Peckham, in Eisenlord v. Clum, 126 N. Y. 552, 27 N. E. 1024, says, at page 567, 126 N. Y., and page 1028, 27 N. E.:

"Although admissible, the evidence is liable to grave suspicion. Indeed, we are bound to say that this whole case presents itself as full of suspicion. The silence of the woman during all these years as to the marriage—silence which was continued until the death of her alleged husband—is in and of itself a suspicious fact. Admissions of a marriage are under such circumstances most unsatisfactory, and open to grave doubt. If such declarations were in truth ever made, there may have been motives which it is impossible to fathom, and which may at the same time have operated upon Eisenlord and induced him to make an admission of this kind when it was wholly untrue. Where the facts are of comparatively recent occurrence, and the alleged declarations of the deceased are at war with his known actions during his life, and when there was no cohabitation or recognition of the party as husband or wife, it may be averred that the evidence is to be looked upon with very much distrust."

How applicable is this language to the present case! What more natural than that Miranda, after she commenced to receive attention from David Yates, should want to rehabilitate her reputation? Here was this 9-year old boy, named Rensselaer Rawson, living with her. Was she going to confess to this suitor, who, for aught that appears to the contrary, was a respectable man, that she was the mother of an illegitimate? And after her daughter Sarah was born, who, it seems, was asking questions (how it was that her brother's name was Rawson, while hers was Yates), was this mother going to confess her shame to her? Albert Bronson, who was born in 1819, a son of Miranda's brother John, to whose house she went first after being turned away from Caleb Nichols', says that shortly after the child was born Miranda came to his father's house, and there was a talk about her and deceased, between her and her brother and his wife, and that Miranda said that, if deceased had not run away, he would have had to marry her. Witness also swears that deceased went away before the child was born, and that he never lived in the log house; that Miranda never claimed in his hearing or presence that she was married; and that the repute and understanding in his family was that the child was illegitimate. But Miranda knew that her marriage was disputed. Of this there is the most convincing proof. She was living under the shadow of public reproach, and she knew that her child was looked upon as illegitimate. Her knowledge of this is manifested by her repeated declarations that she was married, and by Elder Cross. Jacob Wall, one of contestants' witnesses, says that before she married Yates there was a question among the neighbors whether she was married to deceased, or not; to use his language, "there was a betwixt and between." Then why did not she write to Elder Cross and get a marriage certificate, thus setting these doubts at rest, for her own sake and that of her boy, her husband, and her two daughters? The elder was living until 1861, and his son married Miranda's sister. She must have known where he was before she married Yates. Why did she not do this when she and her 17

year old daughter, Sarah, were visiting in Steuben county, when the elder was right there, and the subject of her marriage was brought up? This was at least 27 years after her alleged marriage. Is it not strikingly significant that she did not, if it be true that Elder Cross did marry her to deceased?

But let us go back to 1831. What will more arouse a quiet country neighborhood than the anouncement that a woman in their midst.has sworn a child on some neighbor and had him arrested? What could add more to the excitement than that she should, on the arraignment of the prisoner, declare his innocence and charge it on another? It would be the subject of excited talk at the post office and store every night for weeks, at quilting bees, tea parties, and social gatherings. Every gossip, male and female, within a radius of 10 miles, would roll it under their tongues as one of those sweet morsels of ill and evil repute which is so full of attraction. Is it natural to suppose that in case this erring brother and sister should marry, immediately after the law proceeding, and while the excitement was still at its height,—marry right there in the neighborhood, an elder who lived among them performing the ceremony, —is it possible that it would not have been known by somebody, heard of by somebody? And yet there is not a witness who claims to have heard of it at the time, or about the time, as an event about the happening of which they heard when or about how it occurred. Even Smith Nichols, in whose family Miranda lived when her condition was first discovered, and who in March or April, 1832, went to the log house, had not heard of it, for he says he went to find out whether they were married or not. Has Miranda, in her numerous declarations, ever given the date thereof, or the place, or who were the witnesses, or has any other witness? No; not in any instance. In all of this family dispute, in all these declarations said to have been made by different people, now dead, it yet remains undisclosed when or where this marriage took place.

Another point to be considered is whether these parties ever cohabited. It has already been seen that there was no cohabitation before the child was born. Was there any after that event? There are but two witnesses who swear that there was,—Nichols and Howard. The evidence of the latter, however, is too meager and general to have much, if any, weight. Nichols is, no doubt, the most valuable witness for the contestants, of all produced by them, provided he remembers all that he claims to, and has not undertaken to tell too much. It is he who tells the story about the legal proceeding against Wheeler. It is he who says that Miranda told him that the marriage took place before the child was born, and it is to be observed that this is the only proof in the case that pretends to establish this fact. It is he who claims that deceased cohabited with Miranda after the child was born, and that deceased admitted that he was married to her. No other witness has intimated any such thing. He was born in 1817, and Albert Bronson says that he lived six or seven miles from the log house at the time in question. Witness says that when this child was 2 or 3 months old he called at the log house to satisfy his mind as to whether

this man and woman were married or not. He was just 15 years old. Miranda was 7 years his senior. He knew deceased by sight only; had no acquaintance with him. When he went in, Miranda was getting dinner. Deceased was present, and Miranda's mother was holding the baby. He said: "Good morning, Mr. and Mrs. Rawson. You have got a pretty nice baby here." "Yes," says she. "There is a report around that you ain't married." "Well," says she, "I am married, and I asks no odds of them; and, if they don't believe me, they can ask Elder Cross. Can't they, Rawson?" And he said, "Yes." He says: That they had then been living there some two or three months. That deceased went away from the 1st of June, 1832, and that after he had gone Miranda told him "that the poor master threatened prosecution of him,—to put him through." She said "they went and got married by Elder Cross, and that that was before the child was born." To say nothing of the explicit contradiction by others, his story is condemned by its utter improbability. His salutation of "Mr. and Mrs. Rawson" is strained and unnatural; and that he would ask any such impudent question of these parties—thereby throwing a doubt on the morality of their relations, one of them being practically a stranger, and after he had just addressed them as husband and wife—is too much to be believed. Aside from this, he pretends to give the exact language of a conversation which did not in any way concern or interest him, and which was of a character not likely to impress itself on his mind, which occurred, if at all, when he was but 15 years old, and nearly 70 years ago. It is quite improbable that he would remember the incident at all after all these years,—he was in no way related,—and certainly not that he said, "Good morning, Mr. and Mrs. Rawson." It must be observed that most if not every essential element to the contestants' case is embodied in this story: The salutation to them as husband and wife. The presence of the baby, so it was after its birth. The presence of deceased, so there was cohabitation after the birth. The admission of the marriage by both, by Elder Cross, thus corroborating other witnesses as to the elder. If this story is to be believed, then this witness has, single-handed and alone, established all that it was necessary to establish to make the side on which he testified successful. It is sufficient to say that this story is not only without any corroboration, but is contradicted, not only by other witnesses, but by the probabilities arising from the whole record. It is somewhat remarkable, if these parties did live together for two or three months after the child's birth, that this witness was the only one who knew it. The witness Bryan testifies that Nichols told him that deceased "skipped out" before the baby was born, and there is convincing evidence that he then told the truth.

There is no dispute that Miranda never saw or heard from deceased, after he left Remsen, until 1850 or 1851,—nearly 20 years. She was then the wife of David Yates, and had been for 10 years, and was living with him and young Rensselaer and her two daughters, Sarah and Elizabeth, in the town of Russia, Herkimer county. Young Rensselaer was then 18 or 19 years old, and Sarah was 8

or 9. She says: That deceased drove up to the door, and knocked. Her mother went to the door. He said, "Don't you know me?" and she said, "Yes." She looked a minute and said, "Why did you come here after you have been gone away so long?" "He said the reason was he was up north looking for cattle, and he thought he would stop and see if she wanted to go with him; and my mother says: 'Why, certainly not. Here I have got two little girls to bring up.'" Witness also says that Rensselaer went away with him. She also testified that when she was 13 years of age, which would make it 1855, she came to Troy with her half-brother, Rensselaer, and he went out and brought deceased to the depot, where she had waited, and that her brother called him "Father," and recalled her to him as one he had seen when he stopped at the house, and that after some conversation deceased gave him some money, and they left for Rome, where they lived. With the above exception, there is no evidence that deceased ever saw or heard from Miranda since he left Remsen in 1831; nor does it appear that she ever made any effort to find him, or assert her rights as his wife and the father of her child. The same is equally true as regards young Rensselaer. He never saw him or heard from him, except in the two instances just referred to. Miranda lived until 1872, and young Rensselaer was supposed to have been drowned in 1869. Deceased, when he left Remsen, came to Troy and lived here openly and without concealment until 1896,—about 65 years,—when he died. There is is no evidence that anything was said on either side at the meetings in Russia and Troy which indicated a marriage relation, and, although the witness Sarah Reno has shown a worthy and commendable interest on this trial to clear her mother's name, she would not swear that more was said than as above detailed, which affords one of the strong reasons for confidence in what she did testify to. There is no evidence, excluding Nichols' story, that deceased ever recognized Miranda as his wife, or that he ever admitted any such relation. During all these years they lived their respective lives separate and independent of each other,—as much so as though they were perfect strangers, always excepting the visit at Russia; and certainly that meeting was not such as would be expected between a wife and a husband who had abandoned her 20 years before, and whom she had not since seen. No reference was made to their marriage; no word of censure of his recreancy, not only to her, but to his son. She acted, it would seem, as one would if there had been no marriage.

Thus, upon the question of marriage we find: (1) That the relation between these parties was immoral in the beginning. (2) That their meetings were not frequent, and there was no cohabitation. (3) That there never was any matrimonial intention on the part of either, at least before the threat of the poor master, and no voluntary intention on the part of deceased after that. (4) That, if deceased did marry her, it was solely because he was threatened with prosecution for a fraudulent attempt to extort money from Wheeler. (5) That the threat, if any, was as likely, at least, to induce him to run away as to marry. (6) That he did run away and come back

to his old home before the child was born, and lived here until 1896, when he died. (7) That the marriage, if any, occurred before the child was born. ' (8) That he has never in any way recognized her as his wife, or admitted his marriage to her. (9) That he never since the time of the alleged marriage lived with her. (10) That they never met after he ran away until about 20 years had passed; and then nothing was said about their having been married. (11) That she lived until 1872,—over 40 years after the alleged marriage, —and never asserted her conjugal rights against deceased. (12) That she had this child by deceased, and it was the product of an illicit and immoral connection. (13) That there is no direct proof of marriage; no certificate or record thereof; no witness produced who was present; no proof as to its date or where it was performed; no proof as to who was present; no witness produced who says that he or she recollects hearing of it at or about the time thereof. (14) That, if any marriage occurred; it must have been the subject of much comment and talk in the community, and generally known. (15) That Miranda knew that it was quite generally doubted by the neighbors, and she could have got from Elder Cross, who was her sister's father-in-law, and was living until 1861, a marriage certificate; yet she did not do so, although she in 1858 or 1859 visited in his family, he being present, and the subject of her marriage was brought up in the family conversation. (16) That the only evidence of marriage consists of what witnesses say they heard members of the family say, and also their own testimony as to family repute. That such repute is a divided one. That these declarations were made after she had married Yates, or while he was courting her. Before she married Yates she went · by the name of Bronson, and not Rawson. (17) That these declarations, other than of Miranda herself and Elder Cross, were made by persons who knew nothing personally of the marriage, some of them not born until afterwards, others were too young, and they all come from her relatives who had a natural interest in having it appear to her husband, Yates, and her two daughters, that she was a virtuous woman.

In addition to this it is claimed that the marriage of Miranda to Yates is evidence that she was not before married; otherwise, she would have been guilty of bigamy, and that the law would presume her innocence, and hence that she was a single woman. But deceased had then been absent for eight years, and there is no evidence that she had heard from him, or knew or had reason to believe that he was alive. There is some proof that he had, within five years after his departure, been in the town of Remsen for a short time, but there is nothing to show or to justify the inference that she knew or ever heard of it before her said marriage to Yates. It is true that John Rawson, the brother of deceased, continued to live in said town for several years after he left, but it is not probable that he would have furnished her any evidence against his brother. The evidence doubtless justifies a strong suspicion that Miranda knew decedent's whereabouts, but it is possible that she may not. If she had heard nothing of him for five years, aft-

er making in good faith an honest effort to ascertain his whereabouts, and whether he was living or dead, she had a right to presume him dead and to contract another marriage. In case she was married to deceased, the law presumes that she did make such effort. She could not have been convicted of bigamy without such proof, either direct or inferential, for the law presumes her innocent. It is also claimed that her cohabitation with the peddler, De Castro, in 1835, and her having a child by him, is evidence that she was not then married to De Castro. Their cohabitation was but for two or three months. Their relations were in no sense matrimonial. Neither were they criminal. They were simply immoral. It is even no proof that she was unchaste four years before.

It is also claimed that the deceased married one Mary Irving or Moloman after his return to Troy, and during the life of Miranda, and that this fact is evidence that he was not then married to Miranda. There is no proof of a ceremonial marriage between these parties, probably because of an omission in the church record. She was a woman of irreproachable character and respectability. They lived together as husband and wife for many years, and until her death, which occurred in 1885. The evidence justifies the conclusion that their relation in the beginning was founded upon a matrimonial agreement. He always recognized and introduced her as his wife, so mentioned her in one of his wills, and erected a monument to her in their burial lot in Oakwood Cemetery, on which he caused to be inscribed the declaration that she was his wife. She went by his name, and was, without exception, accepted and acknowledged as such by all their friends and acquaintances. It is not quite clear just when this relation began, but it was about 1836. Mary came to this country in 1834. While this evidence does not have the weight that would result from a ceremonial marriage, nevertheless their open and public cohabitation and acknowledgment for nearly, if not quite, 50 years, is in effect a continuous declaration on his part that he had no other wife living.

In conclusion, while recognizing the strong inclination of the law to find legitimacy rather than illegitimacy, morality rather than immorality, marriage rather than concubinage, nevertheless courts cannot do so where the offspring is shown to have been the product of an illicit intercourse, unless there is evidence of such character and weight as satisfies the mind and conscience that the relation was changed to a moral and matrimonial one before the birth. The evidence here does not sustain such conclusion, but, on the contrary, that the father of contestants was born out of wedlock, and therefore that they are not entitled to share in the distribution of the estate of deceased. Decreed accordingly.