Hynes v. McDermott.

---

MARY ELIZA HYNES, et al., Respondents, against KATE McDERMOTT, et al., Appellants.

(Decided November 10th, 1879.)

An appeal to the general term, from an order denying a motion for a new trial on the judge's minutes, as well as from the judgment, brings all the evidence up for review, and the general term, in the exercise of a sound discretion, may set aside a verdict which, upon due examination, appears to have been influenced by passion or prejudice, or one that is clearly against the weight of evidence.

In this state marriage is nothing more than a civil contract.

Where persons capable of contracting marriage make an agreement of marriage with each other, per verba de presenti, in a foreign country, the presumption is in favor of the validity of the marriage.

A party seeking to establish the invalidity of such a marriage, as not being in accordance with the law of the foreign country, must show affirmatively what was the law of such foreign country at the time of the marriage.

To prove the law of a foreign country at a particular time, testimony of a

---

* The judgment entered upon this decision was affirmed by the Court of Appeals, June 1st, 1880 (see 81 N. Y. 255).

Hynes *v.* McDermott.

lawyer of that country, who has not been there since several years before the time in question, and the production of a Code of the laws of such country, published before that time, without evidence that the law upon the particular subject-matter has not since been repealed, modified or amended, are not sufficient to meet the requirements of our Code as to the mode of establishing the authenticity of a foreign law.

The rule is well settled that, upon the question of the genuineness of a signature, other signatures cannot be shown in evidence merely for the purpose of comparison. Comparison is to be allowed only with signatures to instruments which have been received in proof of some other fact, even though the signatures offered have been admitted by the alleged signer to be genuine.[*]

In an action of ejectment, for premises situated in the City of New York, the plaintiffs claimed as the widow and sons of the late owner by a marriage, the validity of which was disputed. the defendants claiming as his tenants and heirs at law. Upon the trial, the jury found, upon sufficient evidence, that the deceased and the alleged widow, in the city of London, had entered into an agreement to be then and thenceforward man and wife, and did thenceforward cohabit together in the open and acknowledged relation of man and wife, such agreement being made with the *bonâ fide* intention, on his part, to contract a valid marriage; and that, subsequently, they, while crossing the English Channel, entered into an agreement by which they consented to take each other, then and there, as man and wife, and afterwards, again, in France, entered into a like agreement. *Held*, that even if there was no valid marriage in England, and, although, there being no evidence as to the nationality of the vessel in which the parties crossed the English Channel, nothing could be inferred on that point; yet, in the absence of any competent evidence as to the law of marriage in France at the time, it must be presumed that the law of France was either the same as that of New York or the common or civil law; and as the agreement, found by the jury to have been entered into between the parties, constituted a valid marriage according to either of these laws, such marriage must be held by the courts of this state to be valid.

Appeal from a judgment of this court entered upon a verdict for the plaintiffs, and from an order denying a motion for a new trial, made upon the judge's minutes.

This was an action of ejectment for premises situated in the City of New York, and for the recovery of mesne profits. The plaintiffs claimed as the widow and children of William

[*] By an act of the legislature, passed since the trial of this case (Laws of 1880, ch. 36), proof of signatures by comparison of handwriting is allowed.

R. Hynes, who died, seized of the premises in question, and intestate.   The defendants denied the validity of the marriage of William R. Hynes alleged by the plaintiffs, and claimed the premises, two of them as his sisters and heirs at law, the others as their tenants.

Upon the trial it appeared that William R. Hynes had, for a long time previous to the year 1871, resided in the City of New York, and that about that year he went, for temporary purposes, to Europe.   In England he became acquainted with the plaintiff, who now alleges herself to be his widow, and who was then the widow of one Charles Saunders; her maiden name being Mary Eliza Millis.   She was born and resided in London.   Mr. Hynes was accustomed to visit at the house where she resided, and in the latter part of May, 1871, they began living together as husband and wife, after an occurrence which was described in the deposition of Maria Ardray, who resided in the same house, as follows:   "On my return from the theater, I met the late William R. Hynes in the hall; I asked him why he was going, when he said Lizzie (meaning Mrs. Hynes) and he had quarreled because he had not kept his promise of marriage.   I persuaded him to go up-stairs to Mrs. Hynes's room; and he went up-stairs with me to the room. There were present in the room Mrs. Hynes and my husband. Mrs. Hynes was very angry, and she told me the reason of her anger; it was because Mr. Hynes had not performed his promise of marriage; and Mr. Hynes immediately said he did not believe in the marriage ceremony; he considered a man and woman who were true to each other quite as much married as if the ceremony had been performed over them in a church, and then gave Mrs. Hynes a plain gold ring, which she accepted on these conditions.   He remained there all night."

.The husband of this witness testified to substantially the same facts.   Mr. Hynes and the plaintiff immediately began living together as man and wife, and continued so to do, in England and upon the continent of Europe, until his death, except during his temporary absences; and a large number of witnesses testified that he uniformly during that time addressed

Hynes *v.* McDermott.

and treated the plaintiff as his wife, and so introduced and designated her to others.

The plaintiff herself testified, that soon after the transaction above described, Mr. Hynes took her to France, and that on the steamboat crossing the English Channel, she having expressed doubt of the validity of their marriage, and he having assured her that crossing the channel would legalize the marriage, " he said ' if you wish it, I will repeat my promise to you, if you will do the same.' He did so, and told me he would take me for his wife, and I answered him in the same manner." She further testified that after their arrival in France, this agreement was again renewed; and that he uniformly introduced her as his wife to everybody they met who knew him. Her two children, the infant plaintiffs, were born, respectively, in 1872 and 1873.

The plaintiff and her brother testified that Mr. Hynes frequently spoke of his intention of taking her with him to America to live. He returned to New York for a time during the summer of 1872, and occupied as a residence part of the premises in question. He was in the United States again in 1873; and in June, 1874, shortly before his decease, and while confined to his bed by the injuries which resulted in his death, he wrote to his sister, one of the defendants, in America, from London, that he intended to leave there in August, and would bring her anything she might wish " brought home." He died June 27th, 1874. The plaintiffs never came to America until after his decease.

A witness for the defendants, one Loader, a detective, testified that he was present at the examination of other witnesses under commission, in London; that he there saw two signatures in a bank book, which the plaintiff, being also present, admitted were written by her; and the defendants offered to prove by him, from the knowledge thus acquired, and upon a comparison of copies of those signatures with other alleged signatures to documents produced by them, that the latter signatures were in the handwriting of the plaintiff; but this evidence was excluded.

The defendants having given evidence of the English stat-

utes regulating marriages, offered, to prove the law of France on that subject, a publication in two volumes, the first edition of which was dated in 1859, and the last in 1877 ; as to which their witness, Michael Rey, testified that it contained the French Code, explained and commented on by Rogron, and another book which he said contained the Five Codes and the State Laws of France. The witness testified that he had been licensed as a lawyer in France in 1837, and practiced law there for twenty-two years ; that he left France in 1863, and had never seen or used there the books produced ; that there were many editions of the Codes, and he had no doubt the edition by Rogron, produced, was an exact copy of the French law, and would be received in the courts of France as evidence of the existing law ; but the defendants' offer to read from these two volumes the statute law of France on the subject of marriage was rejected, upon the plaintiffs' objection that the proof was not what the Code called for.

Specific questions were submitted to the jury, which are stated in the following opinion of LARREMORE, J. ; upon all of which the jury found in the affirmative, in favor of the plaintiffs ; and also a verdict for the plaintiffs for the possession of the property, and damages for withholding the same. A motion by the defendants for a new trial, made upon the judge's minutes, was denied, and judgment for the plaintiffs was entered upon the verdict.

From the judgment and the order denying the motion for a new trial, the defendants appealed.

*John Hallock Drake*, for appellants. The general term have the right, and it is their duty, when the evidence is conflicting, on a motion for a new trial, to review the evidence and to set aside the verdict and grant a new trial if it is clearly against the weight of evidence (*Macy* v. *Wheeler*, 30 N. Y. 237 ; *Courtney* v. *Baker*, 60 N. Y. 6 ; *Wright* v. *Hunter*, 46 N. Y. 409 ; *Sands* v. *Crook*, Id. 564 ; *Boos* v. *World Mutual Life Ins. Co.*, 64 N. Y. 242). The witness, Loader, should have been allowed to prove the signature of plaintiff (*Smith* v. *Sainsbury*, 5 Carr. & P. 196 ; Cowen & H. Notes to 1 Phil.

Ev. 1324, 1325 ; 2 Stark. Ev., 6th Am. ed. 373, 374 ; *Johnson* v. *Daverne*, 19 Johns. 135). The *lex loci contractus* determines the status of the parties (1 Bishop Marr. & Div. § 335 ; Story Confl. Laws, §§ 79–81 ; *Dalrymple* v. *Dalrymple*, 2 Hagg. Con. 54 ; *Herbert* v. *Herbert*, Id. 271 ; *Scrimshire* v. *Scrimshire*, Id. 395 ; *Conelly* v. *Conelly*, 2 Eng. L. & Eq. 570 ; *Stevenson* v. *Greely*, 17 B. Monr. [Ky.] 193 ; *Medway* v. *Needham*, 16 Mass. 157 ; *West Cambridge* v. *Lexington*, 1 Pick. [Mass.] 506 ; *Putnam* v. *Putnam*, 8 Pick. [Mass.] 433 ; *Matter of Webb*, 1 Tuck. 373 ; *Davis* v. *Davis*, 1 Abb. N. Cas. 140). The presence of a priest or clergyman is absolutely necessary to the validity of a common-law marriage (*Queen* v. *Mills*, 10 Clark & F. 534 ; *Beamish* v. *Beamish*, 9 H. L. Cas. 274).

*Joseph H. Choate* and *William H. Secor*, for respondents. The marriage acts of Great Britain do not apply to an American citizen who marries while temporarily sojourning in England, and intending to return with his wife to America as his permanent home. English authorities recognize the validity of marriages contracted by British subjects in foreign countries in accordance with the law of the domicil under similar circumstances (*Ruding* v. *Smith*, 2 Hagg. Cons. 390 ; *Harford* v. *Morris*, Id. 423 ; *Middleton* v. *Janverin*, Id. 437 ; *Latour* v. *Teesdale*, 8 Taunt. 830 ; *Harfords* v. *Higgins*, 2 Hagg. Cons. 432). The French authorities claim that a French subject married abroad is governed by the laws of France in all that concerns the substance of the contract, and the conditions affecting his capacity to contract (Duchesne du Mariage, Savegny, viii., § 381). The law of America recognizes the validity of marriages of American citizens temporarily sojourning abroad, which are valid by the law of the domicil, even when they disregard provisions of the *lex loci contractus* (Story Confl. Laws, § 113 ; Whart. Confl. Laws, §§ 170, 180, 141 ; *Simonton* v. *Wallace*, 2 Swab. & T. 67 ; Friedburg, 127, 150 ; Reinold Schmid, Herrschaft der Gesetze, 79 ; 1 Whart. Ev. 100, § 83 ; *Hutchins* v. *Kimmel*, 31 Mich. 133 ; *Newbury* v. *Brunswick*, 2 Vt. 151 : *Brower* v. *Brower*, 1 Abb. Ct. App.

Dec. 214; *Loring* v. *Thorndike*, 5 Allen [Mass.] 257).. The marriage upon the high seas was valid. The presumption is always in favor of the validity of a marriage, and any fact which would invalidate it must be conclusively proved (*Piers* v. *Piers*, 2 H. L. Cas. 331; *Morris* v. *Davies*, 5 Clark & F. 163; 1 Bishop Marr. & Div. 457; *Steadman* v. *Powell*, 1 Add. Ecc. 58; *Catterall* v. *Sweetman*, 1 Rob. 304; *Legeyt* v. *O'Brien*, Milw. 325; *Maxwell* v. *Maxwell*, Id. 290; *Else* v. *Else*, Id. 146). A contract *per verba de presenti*, between two persons capable of marrying, to take each other for husband and wife, is a valid marriage by the laws of New York (*Bissell* v. *Bissell*, 55 Barb. 325; Bishop Marr. & Div. §§ 78, 162; *Fenton* v. *Reed*, 4 Johns. 52; *Clayton* v. *Wurdell*, 4 N. Y. 230; *Ferrie* v. *Public Adm'r*, 3 Bradf. 151; *Tummalty* v. *Tummalty*, Id. 369; *Grotgen* v. *Grotgen*, Id. 373; *Rose* v. *Clark*, 8 Paige, 574; *Matter of Taylor*, 9 Paige, 611; *Cheney* v. *Arnold*, 15 N. Y. 345; *Hayes* v. *People*, 25 N. Y. 390; *Van Tuyl* v. *Van Tuyl*, 57 Barb. 235). There was no error in the refusal to permit the witness Loader to testify as to handwriting, upon a comparison with documents not in evidence (*Fitzwalter Peerage*, 10 Clark & F. 193; *Doe* v. *Suckermore*, 5 Ad. & E. 703; 1 Whart. Ev. §§ 707, 712, 713; *Van Wyck* v. *McIntosh*, 14 N. Y. 439; *Randolph* v. *Loughlin*, 48 N. Y. 456; *Goodyear* v. *Vosburgh*, 63 Barb. 154; *P. & W. C. R. R.* v. *Hickman*, 28 Pa. St. 318; *Woodward* v. *Spiller*, 1 Dana, 179; *Pierce* v. *Northey*, 14 Wis. 9; *Miller* v. *Johnson*, 27 Md. 6; *Burdick* v. *Hunt*, 43 Ind. 381; *Jumpertz* v. *People*, 21 Ill. 375; *Kernin* v. *Hill*, 37 Ill. 209; *Moore* v. *U. S.*, 9 U. S. [1 Otto], 270; *Tome* v. *R. R.*, 39 Md. 90–93; *Dubois* v. *Baker*, 30 N. Y. 355; *Baker* v. *Squier*, 1 Hun, 448; *Bank of Com.* v. *Mudgett*, 44 N. Y. 514).

LARREMORE, J.—The plaintiffs, as widow and heirs at law of William R. Hynes, deceased, brought suit in ejectment, and for the recovery of mesne profits, of premises situated on the north-easterly corner of Madison avenue and Twenty-seventh street, in the city of New York.

The action was originally commenced against the tenants

in possession, and was subsequently amended by the joinder of
the heirs at law of the deceased intestate, the acknowledged
owner of the premises in dispute. The main question to be
decided is that which relates to the marriage between the
parties, and the legitimacy of the children as a result of such
marriage.

In addition to the general issue, the judge, at trial term,
submitted the following special findings of fact:

First. "Did Wm. R. Hynes and the plaintiff, Mary
Eliza Hynes, at 169 Cleveland street, in the city of London,
enter into an agreement, to be then and from thenceforward,
man and wife, upon the occasion, in the evening of the last
Wednesday of May, 1871, testified to by Mr. and Mrs.
Ardray?"

Second. "Did Wm. R. Hynes and the plaintiff, Mary Eliza
Hynes, thenceforward cohabit together in the open and
acknowledged relation of man and wife?"

Third. "Was Wm. R. Hynes, at the time of said agree-
ment, a citizen of the State of New York, and temporarily
sojourning in England?"

Fourth. "Was the agreement made with the *bonâ fide* in-
tention on the part of Wm. R. Hynes, to contract a valid
marriage, according to the laws of the State of New York,
and to return to the said State and reside there with the said
Mary E. Hynes as his wife, and did that intention continue up
to the time of his death?"

Fifth. "Did Wm. R. Hynes, deceased, and Mary E. Hynes,
in May or June, 1871, while crossing the English Channel,
enter into an agreement by which they consented to take each
other then and there as man and wife?"

Sixth. "Did Wm. R. Hynes, deceased, and Mary E. Hynes,
in June, 1871, in France, enter into an agreement by which
they consented to take each other, then and there, as man and
wife?"

Seventh. "Is the infant plaintiff, Wm. R. Hynes, the child
of Wm. R. Hynes, deceased?"

Upon all of said special findings the jury found in the
affirmative.

This appeal being from the order denying the motion for a new trial on the judge's minutes, as well as from the judgment, brings all the evidence up for review at the general term. There can be no doubt of the right of that tribunal to review and reverse a verdict, which upon due examination, appears to have been influenced by passion or prejudice, or one that is clearly against the weight of evidence (*Macy* v. *Wheeler*, 30 N. Y. 237; *Courtney* v. *Baker*, 60 N. Y. 6; *Boos* v. *World Mutual Life Ins. Co.*, 64 N. Y. 242).

But such an appeal should be addressed to sound discretion, and an unmistakable conclusion upon the facts as found.

We are called upon to deal with the validity of a marriage affecting rights of property within this State. If it shall appear that the findings of the jury support the existence of such a contract, and the various exceptions in the case are shown to be untenable, then the judgment appealed from must be affirmed.

The question, what constitutes a legal marriage, is always important and often difficult to answer. The peculiar nature and sacredness of the relation, the delicate interests involved and the grave responsibilities depending upon it, invite and demand the most careful judicial scrutiny and discrimination.

Elementary writers have busied themselves with the discussion, whether the marriage relation was a mere contract or a status. But legislatures have prescribed the essentials, and courts of law have pronounced upon the validity of that relation. Necessarily then, where independent sovereignties differ, diversity of authority upon this subject must exist. In our own country we often find a marriage, valid in one state, unrecognized in another.

What, then, is to govern where authorities conflict? Shall it be the "lex domicilii," the "lex contractus" or the "lex loci rei sitæ"? Judge Story appears to have regarded marriage as "an institution of society" and not merely a contract which the parties thereto might dissolve at pleasure.

This would seem to be the natural, reasonable and moral aspect of such a relation. But nevertheless the authorities in

this State, point to the conclusion that marriage is nothing more or less than a civil contract.

We come then to the consideration of the alleged marriage between the parties, as shown by the testimony. It is not claimed that its validity has been established, in accordance with the law of England; but the proposition is urged that the reiteration of the marriage vow on the British Channel, and in France, solemnized an act which it was the intention of the parties to consummate.

The testimony of Mrs. Hynes is unimpeached. The jury believed it, and an appellate court, in the absence of gross error or mistake, should hesitate to disregard their findings. It is apparent then, if we are to accept the testimony produced and the verdict rendered, that it was the intention of the parties to enter into the marriage relation. That such relation was followed by its recognition by the deceased, cohabitation and birth of offspring is beyond dispute; and we are now asked, as against the weight of evidence, to reverse the judgment rendered. The facts thus established invoke the old rule of law, "semper praesumitur pro matrimonio," and the burden of proof is thus cast upon the defendants.

What have they offered to disprove the fact of marriage? A registry of baptism with which Mrs. Hynes is not shown to have been connected, and an offer of proof of a lease of premises taken in her former name of Saunders, which she failed to identify.

The jury have found, as above shown, that Wm. R. Hynes at the time of his alleged contract of marriage was a citizen of the State of New York and temporarily sojourning in London; and that the parties to said contract entered into the same with the intention of returning to and residing in the State of New York. Mr. Hynes owned property in the city of New York, that he once resided here is undisputed, and I cannot, confronted by the verdict of the jury, hold that he was not a resident of this State at the time of his alleged marriage.

This court is on record as to a marriage of this character—per verba de presenti (Davis v. Davis, 7 Daly, 308), and the

same theory is affirmed by the supreme court of the United States in *Meister* v. *Moore* (6 Otto, 76).

Conceding, however, for the purpose of argument, the invalidity of the marriage in England, that upon the English Channel and the subsequent one in France next claim attention.

There was no proof of the nationality of the vessel in which the parties sailed, and the court cannot indulge in inferences upon this point (*Piers* v. *Piers*, 2 H. L. Cas. 331; *Morris* v. *Davies*, 5 Clark & F. 163; Bishop Mar. & Div. 457).

Assuming then, as the verdict of the jury warrants, that the parties, who were able to contract, did contract a marriage with a view to a future residence in the State of New York, of which one of the contracting parties has been found to have been a resident, the presumption is in favor of the validity of the marriage (*Clayton* v. *Wardell*, 4 N. Y. 230; *Caujolle* v. *Ferrié*, 23 N. Y. 90; *Bissell* v. *Bissell*, 55 Barb. 325).

The testimony offered to prove the French law as to marriage, did not meet the requirements of our statute. It demands that the *authenticity* of a foreign law or statute be established.

The testimony of Michael Rey (the witness called for that purpose) showed that he had not been in France since 1859, and the Code of law produced was published subsequent to his departure from that country. Moreover, the witness testified that there were Codes of the French law edited or published by Seriat, Rogron, and by a great many other people.

What reliability can be placed upon such testimony? Does it establish as a fact what the law of France was when this marriage was alleged to have been contracted? Clearly not. Since 1859 that law may have been repealed, modified or so amended as to embrace the legality of the marriage in question. The defendants were bound to establish affirmatively what the law of France was at the time of this marriage.

I find no error in the refusal of the judge at trial to admit

the testimony of the witness Loader in relation to a comparison of the handwriting of Mrs. Hynes. The rule is well settled, that signatures cannot be shown in evidence merely for the purpose of comparison, but only when the instrument to which they are affixed has been offered in proof of some other fact (*Wharton Ev.* § 712, 713; *Van Wyck* v. *McIntosh*, 14 N. Y. 439; *Moore* v. *U. S.*, 1 Otto, 270).

I have reviewed the several exceptions in this case and find no substantial error in the rulings. It was tried upon the theory that a citizen of this State, temporarily sojourning abroad, should, so far as property in this State is concerned, be held to the consequences of his own act. The jury having found affirmatively on all the distinctive facts at issue, and no error of record appearing, the judgment and order appealed from should be affirmed, with costs.

VAN BRUNT, J.—The rule seems to be well settled that the validity of a marriage is to be determined by the *lex loci contractus*. So well recognized had this rule become that Congress, in 1860, found it necessary to pass an act in relation to the marriage of American citizens in foreign countries.

American citizens had been in the habit of entering into marriage contracts at the various consulates according to the law of their domicil, under the supposition that as the consulate was under the American flag, the contract was to be deemed to have been entered into upon American soil, and therefore valid, and to be governed by the *lex domicilii*, no matter what might be the law regulating marriage of the country in which the consulate was situated. This position, however, being recognized as entirely false, and it being established that the *lex loci* determined the validity of such marriage, Congress, in 1860, passed an act providing that " marriage in the presence of any consulate officer of the United States, between persons who would be authorized to marry if residing in the District of Columbia, shall be valid to all intents and purposes, and shall have the same effect as if so solemnized within the United States."

Hynes *v.* McDermott.

It is true that decisions may be found applying the *lex domicilii* to such contracts, but in every such case the recognized rule of law has been put aside, because of the hardship which it would work in that particular case.

The marriage in the case at bar, which is alleged to have been entered into in London, would seem to be void.

As to the marriage entered into upon the packet running between Dover and Calais, it would, it seems to me, be a violent presumption to suppose that the vessel carried the American flag. The vessel appears to have been one plying between Dover, an English port, and Calais, a French port, only twenty-one miles distant.

The marriage which the jury found was entered into in France was not a ceremonial marriage, but an agreement of marriage entered into *per verba de presenti.*

Such a marriage is valid according to the laws of the State of New York, and according to the common and civil law; and as there was no competent evidence given as to what the law of marriage is in France, as is shown by Judge LARREMORE's opinion, the presumption is that the law of France is either the same as that of the State of New York, or the common or civil law ; and as the marriage contract found by the jury to have been entered into in France is valid by either of these laws, such marriage must be held by the courts of this State to be valid. The judgment must be affirmed, with costs.

BEACH, J., concurred.

Judgment and order affirmed.*

---

* The judgment entered upon this decision was affirmed by the court of appeals, September 21st, 1880 (see 82 N. Y. 41).