## KUMMER v. CHRISTOPHER & TENTH ST. R. CO.

(Common Pleas of New York City and County, General Term. February 6, 1893.)

REVIEW OF EVIDENCE ON APPEAL.

It is the right and duty of the general term, on appeal from an order denying a new trial, to reverse the order when, in its opinion upon the evidence, the case of the respondent is a fabrication.

(Syllabus by the Court.)

Appeal from trial term.

Action by Charles Kummer against the Christopher & Tenth Street Railroad Company, to recover damages resulting from an alleged assault on plaintiff by a driver of defendant's car. Plaintiff had judgment, from which, and an order denying a new trial, defendant appeals. Reversed.

For decision on former appeal, see 20 N. Y. Supp. 116.

Argued before BOOKSTAVER, BISCHOFF, and PRYOR, JJ.

Merrill & Rogers, for appellant.

John C. Fraser, (Herbert T. Ketcham, of counsel,) for respondent.

PRYOR, J. On appeal from an order denying a motion for a new trial, it is the right, and, for that matter, the duty, too, of the court at general term to review the evidence, and to set aside the verdict, if believed to be unsustained by credible proof, and contrary to the justice of the case. Hamilton v. Railroad Co., 53 N. Y. 25, 30; Hynes v. McDermott, 7 Abb. N. C. 98; Engel v. Schoolherr, 12 Daly, 417.

Otherwise there would be no relief from a judgment unaffected by legal error, though resting upon a verdict itself infirm from a defect of evidence satisfactory to the reason and conscience of the court; and, in view of the prevalent disposition of juries, in cases of personal injury, to award damages against corporations upon slight or equivocal evidence, we conceive it an imperative duty not to relax that supervision of their determinations which the law exacts of us in the interest of public justice. The case before us is an instructive illustration at once of this reckless inclination on the part of juries, and of the necessity of the corrective power in the appellate tribunal. Here is a judgment of $3,000 against the defendant corporation, and upon what evidence? Two witnesses appeared for the plaintiff,—he and his son. The plaintiff testified:

"Then he [the conductor] came back again, and took me behind here, and threw me down behind the car. Before he did that he wanted me to pay the fare. I had the five cents in my hand, and wanted to hand the five cents, and he would not take it. Then he threw me down behind the car. * * * I was standing on the platform, crowded with passengers, and, after the car had stopped, the conductor came around and asked me for my fare; and when I offered it to him, without saying a word, he picked me up. lifted me out from the passengers in front of my son, and threw me on the street. * * * My son did not try to do anything. There was nobody standing between me and my son. * * * There were other people on the platform. * * * I did not see anybody offer to pay his fare except myself at the time the driver threw me off. As far as I saw, I was the only person who offered to pay the fare, and yet I was the only person the driver assaulted. * * * I did not say anything to the driver except to pay my fare. He did not say anything to me except to ask me to pay the fare. * * * There had been no hard words between us."

The son testified:

"He said, 'Ain't you going to pay your fare? With that my father says, 'I will pay my fare.' He pulled out five cents, which he had in his hand. * * * So he caught hold of my father, and threw him across the rail of the track. * * * The only person who offered to pay his fare was the person whom the driver picked up and threw on the street. * * * None of the passengers gave me their card or their names. My father did not cry out. I did not cry out."

Upon this story no motive whatsoever is apparent for the alleged assault by the driver. The fare was offered. Why was it rejected, and the plaintiff assaulted? And why should this old man alone, of the many who refused or failed to pay their fare, be selected for ejection from the car? There had been no hard words between him and the driver. Against him the driver had no cause of complaint. Why, then, should he be assaulted, without pretense of provocation, while the offending others were let go with impunity? Then, too, neither the plaintiff nor his son made any outcry, but submitted to the outrage in silence; nor did they appeal to the passengers to bear witness to the wrong; nor did the son, 24 years old, or any passenger, offer to defend or to succor this outraged old man. The story is contrary to all probability; it is incredible. But still further to discredit it, if possible, it was shown without contradiction that, to the ambulance surgeon who was called to take the plaintiff to the hospital, he said—

"He had fallen and hurt his hip. * * * I asked him several times subsequently, and he said he had fallen from the car. * * * The plaintiff did not at any time, either then or while in the hospital, state to me that the driver or anybody

had thrown him off from the car. * * * He said he had fallen on his hip. He did not say at all, except he had fallen from the car on his hip."

The driver of the ambulance corroborates the surgeon, and adds:

"I heard him say in the hospital the same thing; he fell off the car, and he never said in any way to me or in my presence that anybody threw him off the car."

These, be it remarked, are absolutely disinterested witnesses,—the only disinterested witnesses in the case. They were not contradicted by the plaintiff; nor did he offer any explanation of his statements that he had fallen from the car, or of his omission to say that he had been thrown off. It is to be borne in mind, too, that not till the commencement of this action, after an interval of five months, does it appear that the plaintiff ever claimed to have been thrown from the car. Here, then, we have a story which in itself baffles belief; which is supported only by persons with the profoundest interest in the litigation; and which is discredited by the plaintiff's own contradictory statements when he was exempt from the influence of a suit for damages. We are not unmindful that the credibility of a witness is peculiarly for determination by the jury; but this is in case of conflicting testimonies, when, to decide between the respective claims to credence, significance is attached to the demeanor of the witnesses on the stand. Chaffee v. Morss, 67 Barb. 252. Here is no conflict between competing testimonies, nor comparison of the bearing of opposing witnesses; but simply a question of the credence due to a story in itself improbable, and discredited, not only by the contrary statements of the witness, but by all the conceded circumstances of the case. Whether a statement be in itself incredible, and whether and how far it is exploded by the contradictory admissions of the witness, are problems which we are as competent to solve as the jury who tried the case. The question is not as to the credibility of the witnesses, but as to the credibility of the story. The burden of proof was upon the plaintiff. A mere scintilla of evidence was not enough to establish his case; but he was bound to produce proof sufficient to "reasonably satisfy the jury," and upon which they could "properly proceed to find a verdict." Dwight v. Insurance Co., 103 N. Y. 341, 359, 8 N. E. Rep. 654. Upon the evidence, our undoubting conviction is that the plaintiff's case was a fabrication, and that the verdict is against truth and justice. Judgment and order reversed, and a new trial directed, costs to abide the event. All concur.