MARY A. DAVIS, Appellant, *against* SAMUEL C. H. DAVIS, Respondent.

(Decided June 25th, 1877.)

It is a general and universal law that all that is essential to constitute a marriage between parties competent to contract it, is their mutual consent to enter into the marital relation. This consent must be clearly expressed and made known, but no particular ceremony, or form of words, or cohabitation is essential to constitute the marriage. This general law will be presumed to be the law of any civilized country until a qualifying or restrictive law of that country is shown.

Where a form or ceremony of marriage has been proven, it is *prima facie* evidence of marriage, and the burden of proof to show that the form or ceremony did not include the necessary elements to constitute a marriage is upon the party disputing the marriage.

There is no rule of law that requires, in a civil action in which the issues are such that a determination adverse to a party will be an adjudication of the fact that he has committed a crime, the same amount and conclusiveness of evidence as would be required to find the party guilty upon an indictment for that crime. Per VAN HOESEN, J.

Admissions made by a party to an action of a fact within his knowledge and adverse to his interest are strong evidence and conclusive, unless there is other evidence in the case qualifying the admissions, or showing that they are erroneous ; but the testimony of a witness that he has heard a party to the action make such admissions is weak and inconclusive evidence.

APPEAL by the plaintiff from a judgment of this court entered upon a dismissal of the complaint at a trial had at a special term of the court, without a jury, before Judge VAN BRUNT. The decision at special term is reported in 1 Abb. N. C. 140.

The action was for a limited divorce.

Judge VAN BRUNT on the trial found the following facts :

1st. " That in the month of October, 1869, the plaintiff and one J. M. Taylor were residents of the State of Texas, and under the age of 21 years.

2d. That on or about the 11th of October, 1869, the plaintiff, the said Taylor, and the sister of the plaintiff, who

was also the step-mother of the said Taylor, went from Texas into that part of the Indian Territory occupied by the Chickasaw nation, and visited the residence of an Indian preacher, who performed a marriage ceremony *per verba de presenti*, between the plaintiff and said Taylor.

3d. That the said Indian preacher said that he was not a regularly ordained minister.

4th. That the plaintiff and said J. M. Taylor never cohabited together as man and wife, and were never recognized as such by their friends and acquaintances.

5th. That the plaintiff and defendant were married on the 1st day of June, 1870.

6th. That at the time of the marriage of the plaintiff and defendant, the said J. M. Taylor was alive, and is now living."

From the foregoing facts he found, as a conclusion of law, "That at the time of the marriage of the plaintiff and defendant, plaintiff was the lawful wife of J. M. Taylor, and that therefore the plaintiff's case must be dismissed."

The plaintiff excepted to so much of the second finding of fact as found that a marriage ceremony, *per verba de presenti*, was performed between the plaintiff and the defendant by an Indian preacher in the Indian Territory, and also excepted to the judge's conclusion of law.

The evidence upon which the judge based his findings of fact, so far as it is essential to an understanding of the decision here, are stated in the opinion.

*Edward D. McCarthy*, for appellant.

*John McKeon*, for respondent.

CHARLES P. DALY, Chief Justice.—I cannot concur in the conclusion of Judge JOSEPH F. DALY, that the evidence of the marriage of the plaintiff with Taylor rests upon testimony of admissions of a character which is regarded in the law as weak and unreliable. Evidence of admissions is regarded as weak or unsatisfactory where it consists of what a third person, the witness, heard one of the parties say ; for

the reason that such testimony is very easily fabricated, and even when honestly given, is subject to the fallibility of human memory, and because what was said may have been imperfectly comprehended, wrongly interpreted, or misunderstood. But when there is no doubt that the admission was made, there being an admission by the party to the action, who knew the fact, and especially where it is adverse to his interest, it is very strong evidence; and if there is nothing in the case to qualify or show that it was erroneous, it is very conclusive. Such is the case where a fact is sworn to in a deposition made by a party, or where the admission is given in evidence upon the trial, in the presence and hearing of the party to the action who made it, and he afterwards goes upon the stand as a witness and does not contradict it.

This is the nature of the admissions in this case. They consist, in the first place, of the direct evidence of the plaintiff herself as to what occurred on the occasion of her alleged marriage with Taylor, evidence of what took place in her presence, and in a matter in which she was a prominent and important party. So far from being weak or unreliable, it is the very best evidence of what was said and done in a matter of which there is no written memorial, and is especially entitled to weight, when it is given by the plaintiff in the suit and is adverse to her interest; which applies as well to the affidavit originally made by her as to the testimony given by her upon the trial.

The plaintiff's testimony shows that there was a marriage between her and Taylor. All that is essential to constitute a marriage between parties competent to contract it is their mutual consent to enter into the marital relation, expressed in such a way and by such acts as to leave no room for doubt upon the subject. No particular ceremony or form of words is necessary, nor is cohabitation essential to its validity. This is the public and general law, which will be regarded as recognized and prevailing in every civilized country, unless it is shown to be qualified or restricted by the law of the particular country. (*Fenton* v. *Reed*, 4 Johns. R. 52; *Jackson* v. *Winne*, 7 Wend. 47; *Caujolle* v. *Ferrie*, 23 N. Y.

Davis v. Davis.

106; *Connolly* v. *Woolrich*, S. C. 11 L. C. J. p. 197; 3 C. L. J. p. 14 [1867]; on appeal, 1 R. L. [Revue Legale] p. 253 [1869]; Swinbourne on Spousals, 8, 55, 74, §§ 3, 10, 11; Bishop on Marriage and Divorce, §§ 66, 67, 68; Shelford on Marriage and Divorce, 27.)

The plaintiff in her affidavit says that the form of a ceremony of marriage was gone through with on the 11th of October, 1869, between her and Taylor, in the Indian Territory, within the territorial limits of the Chickasaw tribe, in the cabin of a resident in the Indian country; that she was then about 20 years of age, and Taylor was about the same age; that they gave fictitious names; that she did not suppose it to be a binding contract, or intend that it should be; that they were then both living at Bonham, in the State of Texas, and that the ceremony was performed in the Indian country, so that it should not be a contract or valid obligation on either party. That she was induced to do what she did by her sister, who was married to the father of Taylor; that she was told at the time, and believed, and still believes, that no marital obligation was incurred by the ceremony; but that afterwards, recognizing that the act was one of folly on her part, and might entail serious consequences, she applied for and obtained, in the Indian Territory, a dissolution of the contract.

In her oral testimony on the trial, she said that she did not intend by that ceremony to become Taylor's wife; that the ceremony was performed by a half-breed, who was not an ordained minister, but preached at times; that he wore no clerical vestments, and gave no certificate of the marriage; that upon this occasion she went with her sister to the Red River to get some fruit, and did not know that they were going into the Indian Territory; that her sister and she went in a buggy; that Taylor rode a horse, and that they met him at the river; that they crossed the river and went to the cabin which she supposes was the one where the minister lived; that her sister had often spoken to her about marrying Taylor; and after they got into the cabin, asked her if she would promise to marry him in two years, in case of her

(the sister's) death ; and that the plaintiff said to her that she would. That her sister then asked her if she would promise before witnesses, and that she replied that she did not think that her sister had any cause to doubt her word ; that the sister said she would not ask her in Bonham, because people would talk about it, and that she replied that her (the plaintiff's) promise was as good in one place as in another ; that her sister talked a while with the preacher, and he then asked if she would promise to marry Taylor, and if he would promise to marry her ; that she did not say any thing, and that she did not believe he said any thing ; that she was very close to him and heard nothing from him ; that she could not take oath whether the preacher then declared them man and wife. She was asked, " Will you swear that he did not ? " and her answer was, " I cannot take oath to that either." She was asked, " Will you declare whether you were married or not ? " and answered, " To the best of my knowledge and belief I don't think we ever were." The question was then put, " This ceremony was gone through ? " and her answer was, " I have made my statement." The further question was put, " For what purpose was it gone through ? " and she answered, " Perhaps you had better ask my sister ; she may know." The question was repeated, " What was it gone through for ? " and she answered, " I know nothing more." The question being persisted in, she said, " I don't know any other reason only she didn't think she would live long, and in case of her death she wanted I should have her child ; and without she should die, she didn't think or expect us to be married." The further question was put, " Did *she not want you to marry him at that time ?* " and she answered, " *Yes.*" She said that the preacher told them that he preached to the natives, but that the natives (the Indians) could not be married by him, as he was not an ordained minister ; and it appeared in the case, that by the laws of the Territory, all marriages in the Indian nation had to be solemnized by a judge, or by an ordained preacher of the gospel.

Her further testimony was : " After the ceremony we went back to Bonham, in Texas. We immediately left the

Chickasaw nation. Taylor and I separated as soon as we got home. We never lived together as man and wife. Neither acknowledged the other as married. We were never acknowledged as man and wife, either publicly or privately. I subsequently obtained a divorce from the obligation of the ·ceremony."

There are two things here admitted by the plaintiff : 1st. That her sister wanted her to marry Taylor at that time ; and 2d. That a form of a ceremony of marriage was made between her and Taylor at that time. In respect to the latter fact, I quote her own language from her own affidavit. What form was gone through with by the half-breed preacher does not fully appear ; but that is not material. Her admission that a form of a ceremony of marriage took place was *prima facie* evidence of a marriage, and the obligation was not upon the defendant to prove what the clergyman said or did, but upon the one whose interest it was to dispute the marriage. .(*Fleming* v. *The People*, 27 N. Y. 335.) She went with her sister and Taylor to the preacher's cabin and allowed the form of a ceremony of marriage, in her own words, " to be made " between her and Taylor, knowing perfectly well what she was doing ; for she was then a widow and a mother. She says that they gave fictitious names, but that, I apprehend, would not render the marriage invalid. What constitutes a marriage, as I have said, is the mutual consent of the parties to enter into the marital relation ; and that these parties did consent to do so, is shown by their going voluntarily to the cabin of the preacher and having a marriage ceremony performed; by having what, by all fair intendment, it must be assumed the half-breed preacher regarded and·meant to be a marriage ceremony. There is nothing in her testimony to show that Taylor did not so regard it. All that she says in respect to him is, that she did not hear him make any response to the preacher's question whether he would promise to marry her, and she would promise to marry him, in respect to which it is sufficient to say, that although there may have been no response in words, acquiescence on his part and on her part could be expressed simply by an

inclination of the head. Although they all went to the preacher's cabin to have a marriage ceremony performed, and waited for the preacher until he came home, she said that she did not intend it should be binding. What a party intends is inferred from his or her acts, and where the act is plain and unequivocal, especially in matters of contract or mutual undertaking, a party cannot avoid the effect of it by any mental reservation or secret intention. If there had been an understanding between the plaintiff and Taylor that they would go into the Indian country and go through the form of a marriage ceremony merely for the purpose of leading plaintiff's sister to believe that their intention was to be married, whilst in reality they had no such intention, but on the contrary, a mutual understanding that they would not and did not mean to enter into the marital relation, then in the absence of cohabitation or of any subsequent acts indicating the existence of the relation of man and wife, there might be some ground for claiming that what took place was not in fact a marriage, but a piece of deception, intended for a particular purpose. (*McClurg* v. *Terry*, 21 N. J. Eq. R. [6 C. E. Greene], p. 225.) . But there is nothing in the evidence to show, or from which it can be inferred, that there was any such understanding on the part of Taylor. She says in her affidavit that she did not intend that it should be a binding marriage contract, and that "neither did the other party intend that it should be;" but neither in her affidavit nor in any other part of her testimony does she give any thing he said to warrant her drawing any such conclusion; all that she says in addition being, "I think I had a knowledge of his intentions." On the contrary, so far as respects his acts, he voluntarily submitted to the performance of what was meant to be a marriage ceremony, and in his own family, or at least by his father, it was understood that he had been married to the plaintiff, for the father told the witness Upson that the plaintiff was married to his son before she married the defendant. If the plaintiff had been a young and inexperienced girl, the inference might be drawn that she was possibly unacquainted with a marriage ceremony and ignorant of the

effect of what she did and consented to. But she had been married four years previously in San Antonio, in Texas, to William H. Vance, who died about six months before the ceremony was performed between her and Taylor. She was therefore acquainted with the nature of a marriage ceremony and its effect, and no inference founded upon her ignorance can be drawn in her favor. She says in her affidavit that the ceremony was performed in the Indian country, rather than in Texas, so that it should not be a contract or valid obligation on either party, and yet in her oral examination upon the trial, she says that she did not know that she was going into the Indian Territory. She admits that her sister had been for some time desirous that she should marry Taylor, and that she wanted her to marry him at the time when they were in the cabin of the preacher and before the ceremony was performed. Her sister therefore could not have been a party to the understanding that they went into the Indian country, that it might not be a contract or valid obligation, as it was not carrying out her wishes to have a ceremony performed that amounted to nothing, and the plaintiff has not stated any thing that Taylor said to her or to anybody else to show that he was a party to any such understanding.

The fact that she and Taylor separated after the ceremony was performed, and neither acknowledged the marriage publicly or lived together thereafter as man and wife, is explained by the fact, that it was the intention of the parties to keep the marriage secret, as appears by the plaintiff's admissions to the witness Upson; testimony entitled to be received unhesitatingly as true, as the plaintiff heard Upson's deposition read upon the trial, had her attention called to it when she was a witness, and having the opportunity to do so, did not contradict it.

Upson testified that he told her in 1873, that Taylor's father had told him that she was married to his son before she married the defendant, Davis; that the father said to him that a few months after the death of her first husband, Vance, the plaintiff came up to Bonham and went from thence over into the Indian nation and was there married to

his son; that he, Upson, asked her of this was true or false, and that she answered, " Yes, it is true; but I don't know what business Bob Taylor had telling of it, and I don't believe that marriage was good for any thing any way, as we married under assumed names; neither of us gave our correct names. . . . . I only married Taylor to please sister Pomp. Pomp kept at me and insisted upon my marrying him (Taylor), and would give me no peace until I did." That she further said that her sister Pomp went with her to the Indian nation *and saw them married*, and that after they were married, she said to Pomp, " I hope now you are satisfied;" that in the same conversation she stated that she went to the Indian nation to marry, so that it might be kept a secret and not found out.

This witness, Upson, had been intimate with her and her former husband Vance, and had married a member of the same family. His deposition was read upon the trial before the plaintiff was examined as a witness. She heard it read, remembered it when she was examined, and said in her testimony that there was some conversation between herself and Upson—something to the same effect as the one (the conversation) in her affidavit read the previous day. There is nothing in her affidavit about Vance, or respecting any conversation had with him, so far as that affidavit was read upon the trial, and in no part of her testimony does she deny that she made the statement to Upson which he swears she did; nor does she deny any part of it. So that the judge was justified in believing that she made the statement to this witness as he detailed it, and the judge had the right to contrast her statement then with her testimony upon the trial, and draw his own conclusions as to which was the more credible; a conclusion with which we ought not to interfere, as he had the advantage of seeing her and hearing her give her testimony.

Whilst she says in different parts of her testimony that they gave " fictitious names," " assumed names," and " did not give their correct names," she nowheres states what names they gave, and for all that appears, there may have

been merely a change in the Christian names or some·other slight alteration or modification made in furtherance of the object which she told. Upson caused them to go into the Indian Nation to marry, namely, that the marriage " might be kept a secret, and not found out." Where it is shown that parties went before a clergyman to be married, and had a marriage ceremony performed by him between them, it does not invalidate the marriage that they did not give their correct names, or concealed their proper names for some purpose of their own. It may have been a reason for keeping the marriage a secret, that her husband had been dead but for six months. Her sister appears to have been apprehensive that she (the sister) would not live long, and in case of her death she wanted the plaintiff to have her child. She was consequently very urgent for the marriage. The plaintiff says : " She insisted upon my marrying him, and would give me no peace until I did." But though the sister was urgent, and she was willing to marry Taylor thereafter, she was reluctant to marry him then, the reason of which, I think, is indicated by what her sister said to her ; that she would not ask her to marry him in Bonham, in Texas, where they resided, "because people would talk about it," and very naturally, her husband having been dead but for a short time. It was probably, therefore, to avoid the gossip and comment that would have followed ; that whilst she complied with her sister's urgent wish, the course was adopted of going into the Indian Nation to have the ceremony performed. The departure by separate routes, then meeting at Red River, then omitting to give their correct names, then separating as soon as they got home, all appear to have been precautionary measures to secure secrecy ; that the fact of the marriage might not be known in Bonham, until they thought proper thereafter to make it public.

Two months afterwards she met the defendant at San Antonio, in Texas. Two months after she became acquainted with him, she applied for, and, as she says, obtained a dissolution of the contract in the Indian Territory—a fact not established upon the trial by the necessary proof—and two

months after that she married the defendant at San Antonio.

It is very evident from these facts, that though, at the request of her sister, she voluntarily married Taylor, she was desirous afterwards of marrying the defendant and of abrogating this previous marriage, which had never been publicly acknowledged, or followed up by their living together as man and wife.

Society is too deeply interested in the institution of marriage to allow it to be trifled with in this way; to recognize the right of one of the parties to abrogate it and marry again, because the names were not correctly given to the clergyman who performed the ceremony, or concealed for purposes of their own at the time. In other words, where two parties, competent to contract marriage, deliberately go before a clergyman, or, as is the case, a preacher, and have a marriage ceremony performed, they are, by their own voluntary act, married, and by the laws of civilized countries, or at least by our laws, neither can afterwards evade or get rid of the obligations at his or her mere will or volition. It in no way affects the validity of the marriage, that it took place in the Indian Territory. (See *Connolly* v. *Woodbridge, supra.*) The laws of the Indian Territory are designed for the government of the Indian residents of the Territory, and by treaty nonresident whites are exempt from their operation. (Art. 7, Treaty of 1855.) So far as we know, it would have been a valid marriage, had it taken place in Texas, if the validity of the contract is to be determined by the law of the domicile of the parties.

I see no ground for reversing the judgment of the court below, and, in my opinion, it should be affirmed.

VAN HOESEN, J.—If instead of seeking alimony from the defendant, the plaintiff were now attempting to prove herself to be the wife of J. M. Taylor, there is no court that would not pronounce in her favor, upon proof by others of the facts to which she herself swore upon the trial of the case. It is true that the plaintiff swears to a secret intent upon her part not

to contract a marriage that would impose conjugal duties upon her from the moment of its solemnization, but the events and circumstances which she describes, if not explained away by the account she gives of her privy purpose, would establish beyond controversy or question that J. M. Taylor married her in the Indian Territory after making a journey thither from Texas, with no other object than to make her his wife. The marriage would be binding upon Taylor. An effort is made to show that it is not binding upon the plaintiff.

I deem it unnecessary to restate the evidence which led Judge VAN BRUNT to the conclusion that the marriage between the plaintiff and Taylor was valid and binding upon both parties. It is sufficient to say that the facts stated by him show strong if not conclusive reasons for the judgment which he rendered.

It is objected, however, that the only proof of the marriage of the plaintiff and Taylor consisted of admissions made by the plaintiff; that admissions are entitled to but little weight, and that the value of the admissions in this case is impaired by the consideration that a legal conclusion is indissolubly bound up with them. None of these objections has, in my opinion, much weight. It is a truism that the value of admissions depends upon circumstances. They are certainly not weak evidence when made by a person of acuteness and understanding, who, reluctantly, and with a clear perception of the danger of making them, is compelled to reveal a little of a story which he desires to withhold. The plaintiff in this case is a woman of mature years, whose wits have been sharpened by commerce with the world. Her testimony, given at the trial, shows that she knew perfectly well the weak points of her case as well as the strong ones. She had no alternative but to admit the matters which she had once sworn to in an affidavit, and which she had previously communicated to Upson, whose testimony was in the defendant's hands. She was not betrayed into an indiscreet utterance. Her admissions are to be reviewed, therefore, as we should regard those of a ripe and adroit man of the world. The legal conclusions she may have expressed are, of course, of no

value, but the facts which she admitted should have as much weight as if they had been established by the testimony of well-informed and unimpeached witnesses. Those facts are collected by Judge VAN BRUNT, and they form the basis of his opinion. It was undoubtedly competent for the judge to separate the wheat from the chaff in the testimony of the witness, and to draw his own conclusions from, and to place his own construction upon, the circumstances which she detailed. If those circumstances satisfied him that when she went to the Indian Territory she intended to marry Taylor, that she waited in the cabin for the preacher's return, that she stood up by Taylor's side to carry out the object which brought her from her home to the dwelling of the preacher, the judge was under no obligation to give credit to the statement that, in her breast she harbored, at that time, the secret intention not to be Taylor's wife unless her sister Pomp should die, nor was he bound to adopt her views as to the invalidity of a marriage under false names. It was proper for the judge to consider whether another marriage ceremony was contemplated in the event of Pomp's death, or whether instead of being a mere betrothal the ceremony performed was not, in the estimation of both parties, a binding marriage contract, to be kept secret for two years unless Pomp should die before that period had passed. I see no reason for differing from the learned judge in his conclusion. I am convinced that the plaintiff's intent was to marry Taylor. The circumstances she admits outweigh her denial of intent. It is contended that the judge was not warranted in finding that the marriage of the plaintiff with Taylor was valid unless the evidence of marriage was sufficient to convict the plaintiff of bigamy. I think there is no such rule. There was at one time an impression that where the issue of a civil action involved the question as to whether or not a crime had been perpetrated, the jury were not at liberty to find a verdict, the effect of which was to show their belief that the crime had been committed, unless the evidence would have warranted them in finding the suspected party guilty on an indictment for the same offense. (*Thurtell* v. *Beaumont*, cited in 2

Greenleaf's Evidence, sec. 408.) That is not now the law. (May on Insurance, sec. 583 ; May's edition of Greenleaf on Evidence ; Albany Law Journal, vol. 15, page 444.) The judge was justified in deciding upon a preponderance of evidence that the plaintiff had married Taylor.

Great weight is claimed for the fact that the plaintiff swears that her marriage with Taylor was never consummated. If that evidence were given by any other person than the plaintiff, it might, under some circumstances, be, of some importance; but I think this case presents no exception to the rule, founded upon the soundest reasons, that neither of the wedded pair can testify as to non-intercourse. (*Rex* v. *Luffe*, 8 East, 193 ; 1 Greenleaf's Evidence, sec. 253.)

The judgment should be affirmed.

JOSEPH F. DALY, J., dissented, and was for reversing the judgment and ordering a new trial, on the ground that the evidence was not sufficient to justify the finding as to the former marriage of the plaintiff.

Judgment affirmed.*

---

* An appeal was taken to the Court of Appeals, but subsequently abandoned, the Supreme Court of the United States having made a similar decision in the case of *Meister* v. *Moore*, 6 Otto, 76.