Application for the probate of the will and codicil of Joseph Gall, deceased, Geo. B. Morris, for proponent. A. Simis, Jr., for Amelia Gall, the widow.

ABBOTT, S. Joseph Gall died on the 22d day of May, 1886. Two months afterwards the suit of Gall v. Gall was commenced in the supreme court, Kings county; the plaintiff claiming dower in the real estate of Joseph Gall, deceased, as his widow. This action resulted favorably to the plaintiff, and the judgment was affirmed by the general term and court of appeals, (Gall v. Gall, 114 N. Y. 109, 21 N. E. Rep. 106,) and settled the fact that an unceremonial marriage had been entered into between the parties, without fixing the time when such marital relation commenced. In this proceeding the

delicate duty devolves upon me of attempting to fix this time, which can be done, I think, better negatively than positively.

Joseph Gall left a last will and testament, dated April 3, 1883, with a codicil thereto, dated April 28, 1884. Proceedings for probate were begun in the first instance in the New York county surrogate's court, on the theory that deceased was a resident of the city and county of New York, as undoubtedly he was when both will and codicil were executed. The case of *Gall* v. *Gall*, *supra*, fixed testator's residence in the city of Brooklyn, county of Kings, at the time of his death, whereupon the surrogate of New York county, having lost jurisdiction, dismissed the proceeding, and it was commenced *de novo*, in this court. The testator left a widow, Amelia, and two children,—Betsy A. Gall, born February 29, 1884, and Caroline Gall, born July 8, 1886, about six weeks after the death of the father. The contestants claim that under Rev. St. c. 6, tit. 1, art. 3, § 43, (Banks' 8th Ed. vol. 4, p. 2548,) the will and codicil, being made before testator married a second time, were revoked by such subsequent marriage and birth of issue. It is not contended that testator was married when the will was executed on April 3, 1883; but the proponents insist that this non-ceremonial marriage was consummated some time between the making of said will and the codicil on April 28, 1884. To this I cannot assent. The relation between these parties was, at its inception, confessedly, illicit; and Judge DANFORTH says in *Harbeck* v. *Harbeck*, 102 N. Y. 714, 7 N. E. Rep. 408: "That the union between the parties was at first illegal is conceded. If a change occurred, it was followed by no formal celebration, nor is there evidence of any present agreement to take each other for husband and wife." I do not think the evidence warrants me in finding that these parties had on or before April 28, 1884, "passed by contract or by mutual consent from the state of concubinage into that of marriage." A case strongly relied upon by the proponents is *Badger* v. *Badger*, 88 N. Y. 546. It differs from this case in that the proof therein failed to establish an illicit origin of the cohabitation as a separate and independent fact. Judge FINCH, in his opinion, says, (pages 553, 554:) "The rule that a connection confessedly illicit in its origin, or shown to have been such, will be presumed to retain that character until some change is established, is both logical and just. The force and effect of such a fact is always very great; and we are not disposed, in the least degree, to weaken or disregard it. *Brinkley* v. *Brinkley*, 50 N. Y. 198. Very often the changed character of the cohabitation is indicated by facts and circumstances which explain the cause and locate the period of the change, so that in spite of the illicit origin the subsequent intercourse is deemed matrimonial. *Fenton* v. *Reed*, 4 Johns. 52; *Rose* v. *Clark*, 8 Paige, 574; *Starr* v. *Peck*, 1 Hill, 270; *Jackson* v. *Claw*, 18 Johns. 346. But a change may occur, and be satisfactorily established, although the precise time or occasion cannot be clearly ascertained. If the facts show that there was, or must have been, a change; that the illicit beginning has become transformed into a cohabitation matrimonial in its character,—it is not imperative that we should be able to say precisely when, or exactly why, the change occurred." *Caujolle* v. *Ferrie*, 23 N. Y. 90. But, in order to hold that such a change has taken place, and to approximate the time, it is necessary to show a mutual, present consent between the parties to become husband and wife. "The concubinage which existed for so long a period cannot be transformed into matrimony by evidence which falls short of establishing the fact of an actual contract of marriage. Such a contract, it is true, may be proved by circumstances; but they must be such as exclude the inference or presumption that the former relation continued, and satisfactorily prove that it had been changed into that of an actual marriage by mutual consent." *Foster* v. *Hawley*, 8 Hun, 72. At or before the making of this codicil, I do not think "the shadow cast by their daily lives" would be regarded as matrimonial. The evidence introduced in the dower suit was substantially the same as that before

me in this proceeding; and Judge CULLEN, in his charge to the jury in the dower case, has very aptly and tersely stated the different stages of the relationship as it existed between these parties. He said: "It appears that from time to time the relation between these parties changed,—that at first she was living as his servant in his house, and treated as such; in the second period she was living in apartments in a tenement house which he provided for her,—both situations very much below and inferior to the proper dignity of the wife of a man of means and position, like the deceased. Then there was a third period, when she was living over here, in Brooklyn, in a house bought by him, her mother and sister living with her, and he visiting her more or less, as you may find the fact to be, because there is a discrepancy between witnesses on that point. Then there was the fourth and last period or epoch, when he moved his property over here, and came to live with her."

The commencement of the intercourse in Rutherford place in 1883 was illicit. In January, 1884, the testator places her in a tenement house in East Tenth street, where the first child is born, while he takes a suite of rooms in the Westminster Hotel; and it is while she is living in Tenth street that the codicil is drawn and executed. His relations with her in the Tenth-Street house were, undoubtedly, the same as they were at Rutherford place. He did not live with her, nor hold her out to be his wife. This marks the end of the second period as set forth in Judge CULLEN's charge. She moved over to Brooklyn on the 1st of May, 1884. The defendants in the suit for dower, and the parties interested in having this will admitted to probate, are many of them the same; and they occupy the anomalous position of strenuously contending in the dower suit that no marriage of any kind had ever been entered into between Amelia Steeb and Joseph Gall, and in this proceeding of insisting with equal vigor that a marriage had been entered into on or before April 28, 1884. The principal evidence relied upon to sustain their contention is the cohabitation of the parties; that testator called Magdalena Steeb "mother" prior to the making of the codicil, and that he bought a house in Brooklyn in the latter part of April, 1884, about the time the codicil was executed, which he said was "for his family," or, perhaps, "for his wife and family." This evidence is somewhat uncertain, as the parties who gave it are Germans, and did not speak or understand our language perfectly. The proponents also rely upon the evidence that the wife of the testator's business partner went with the testator to look at the house with him before he purchased it. From this and similar evidence they claim that a presumption of marriage arose on or before the making of this codicil. The testimony of Charles Lempke, the business partner of the testator, to whom he had confided all his relations with Amelia, and who was well acquainted with both parties, indicates that at this time there had not been any mutual agreement of marriage between them, or that he regarded her as his wife. He told Lempke on April 24 or 25, 1884, that his social standing, and the ignorance of the girl, would not admit of his contracting a marriage with her at that time. He went to Europe on the 1st day of May following, and was absent for two months; and when he returned he again took apartments at the Westminster Hotel. In this codicil he describes her as "a former servant of my late wife," and bequeaths her $1,000, and gives $5,000 to his child, leaving the rest of his estate, which was quite large, to his nephews and nieces,—some residing in New Zealand, some in California, and one lately in the city of New York. This testamentary disposition towards her, both in language and amount, renders it strongly improbable that he regarded her as his wife at this time. It appears from the stenographer's minutes, (page 53:) "He said the old lady seemed to give him a good deal of trouble." The old lady was Amelia's mother, and she, undoubtedly, frequently importuned the testator to make some provision for her daughter and the child; and the fact that his partner also urged him to do the same thing seems to me to sufficiently account for

his buying the house in Brooklyn, and installing her family in it, without raising any conclusive presumption that they had then agreed to marry. So, also, his addressing Magdalena Steeb as "mother," and saying "he bought the house for his family," does not seem to me to establish a mutual contract of marriage in the face of the acts and conversations of the testator himself at this time as heretofore mentioned.

I have not allowed any question of sentiment as to the legitimacy of the first child to enter into my decision in this matter; nor have I attempted to state all the reasons which lead me to the conclusion that these parties, on the 28th of April, 1884, had not passed, by mutual consent, from a state of illicit intercourse into that of marriage. Such, however, is the conclusion which I have reached upon the whole case. The will must be deemed revoked ·by reason of the marriage of the testator and birth of issue after its execution; and the application for probate must, therefore, be denied.