reduced to $100 a month. The claim of the plaintiff is that the monthly payments of $162 were payments in excess of interest, and that the excess should be applied to reduce the amount of defendant's claim for principal. The trial court held that these payments were not established by competent or sufficient evidence, and that, even if they were, the excess was intended, not as a payment of interest, but as a filial contribution to the mother's comfort. So far as proof of the payments is concerned, we think the learned judge must have overlooked the testimony of the defendant herself, who, when examined in her own behalf, expressly admitted that her son paid her $162 a month, from September, 1880, until 1885, saying: "Yes, sir; he paid that. That amount was a little more, of course, than the interest due me would have amounted to." We agree with the court below, however, that there is a preponderance of evidence against the proposition that these payments were made to any extent on account of the principal debt due to the defendant from her son. The learned counsel for the appellant argues that the presumption is against the view that the excess was a mere gratuity, inasmuch as the law will not suffer one to be generous before he is just, and where there is an indebtedness will presume that a payment is made in discharge of such indebtedness, rather than as a gift. But, even if we start with these presumptions in the present case, they are overcome by the evidence, which is clear and distinct, to the effect that Mr. Palmer did not intend to pay, or suppose he was paying, anything more on account of the debt to his mother than the interest thereon. It would be unreasonable to hold that he would have omitted all reference in his books to any payment tending to reduce the principal, if the payment was made for that purpose, when his books contained an account especially devoted to the transactions relating to that principal. Indeed, it seems to us that the books of the assignor, upon which the plaintiff relies, furnish the most cogent proof against him. They really afford the only light we have as to the intention of the plaintiff's assignor in making the payments in question, and by expressing such payments to be made for interest they negative the idea that he meant by making the same to reduce his mother's claim against him on account of the principal debt. We think the judgment was right, and should be affirmed.

---

## *In re* GALL.

(*Supreme Court, General Term, Second Department.* July 18, 1890.)

MARRIAGE—WHEN CONSUMMATED.

A testator, shortly after his wife's death, commenced cohabitation with his female servant, and subsequently he bought a house, and placed her there, to live with other members of her family. He visited her there, and treated her as his wife in that locality for several years, and for a few months before his death he lived at the house with her as his wife. After the illicit intercourse, but prior to the purchase of the house in which the woman was installed as wife, the testator executed a will, leaving her a legacy as his "servant." In an action for dower after his death, a jury found that he had married the woman at some indefinite time after the commencement of the illicit intercourse. *Held*, that the marriage occurred subsequently to the execution of the will, which was consequently revoked.

Appeal from surrogate's court, Kings county.

Petition by James T. Law for the probate of the last will of Joseph Gall. The probate was resisted by Amelia Gall and others, and the surrogate refused to probate the will. Petitioner appeals.

Argued before BARNARD, P. J., and DYKMAN and PRATT, JJ.

*Geo. B. Morris*, (*Edwin More*, of counsel,) for appellant. *A. Simis, Jr.*, for respondents.

DYKMAN, J. This is an appeal from a decree of the surrogate of Kings county refusing probate to the last will and testament of Joseph Gall, deceased, because he was married, and had issue of such marriage, subsequent to the

making of his will. There is not a disputed fact in the case, and the statute accomplishes the revocation and nullification of the will, if the marriage and birth of a child were subsequent to its execution. The time of birth of the child is undisputed, and therefore the only thing for our determination is the time of the marriage of the testator, and that question depends upon inferences to be drawn from undisputed facts, which are substantially as follows: Joseph Gall, the testator, lived in Rutherford park, in the city of New York, and his wife died there on the 16th day of February, 1883. At that time he had a domestic servant, who lived in his family, by the name of Amelia Steeb, and after that she became his housekeeper. He commenced cohabitation with her soon after the death of his wife, and she became pregnant in May, 1883. When her condition was ascertained, he broke up his household in Rutherford park, and hired rooms for Amelia in Tenth street, in New York city, and went himself to reside at the Westminster Hotel. That was in January, 1884, and he never lived in Tenth street. Amelia's child was born on the 29th day of February, 1884, and Gall employed the physician to attend her, and paid him for his services. In April, 1884, Gall bought a house and lot in Lafayette avenue, Brooklyn, and Amelia, with some members of her family and her child, left Tenth street, and went there to reside the last of April, 1884. Gall sailed for Europe on the 1st day of May, 1884, and returned in July following, and went to the Westminster Hotel to reside, and remained there until March, 1886, when he went to Brooklyn, and lived with Amelia as her husband until his death, in the month of May, following. About two months after his death, on the 8th day of July, 1886, Amelia gave birth to another child. From July, 1884, to the time of his removal from the Westminster Hotel, in March, 1886, Gall visited Amelia in Brooklyn several times a week, and in the locality where she lived he treated her as his wife. In his codicil, which was executed April 28, 1884, after the birth of the first child, he uses this language: "(2) I give and bequeath to Amelia Steeb, a former servant of my late wife, the sum of one thousand dollars. (3) I give and bequeath to the child of said Amelia, Betsey A. Gall, now of the age of two months, the sum of five thousand dollars." About a week before Gall sailed for Europe, the 1st day of May, 1884, his partner, Charles Lembkie, importuned him to make some provision for Amelia and her child, and he simply said he would do something. This is an extract from his testimony: "*Question.* Now, at the time when the codicil was spoken about, did he give you any reason why he wouldn't marry Amelia? *Answer.* Well, of course, he related to her social standing, and his social standing. This was on the 23d or 24th of April, when I went down with him about the codicil. He mentioned the ignorance of the person; he said his social standing would not admit of a marriage; that is, contracting a marriage at that time." After the death of Gall, Amelia commenced an action for the recovery of dower in his estate, and obtained a judgment, which was affirmed in the supreme court and court of appeals. 114 N. Y. 109, 21 N. E. Rep. 106. The jury in that action found that Gall and Amelia intermarried between the month of February, 1883, and the death of Gall, and found a general verdict in favor of the plaintiff, but the time of such marriage was not fixed. The facts already recited are sufficient to enable us to determine the character of the association of these parties at both ends of the line of their intercourse. At the first their relations were licentious, and at the last they were matrimonial; and we are required to find the time when the latter commenced, or, rather, to find whether they were married when the codicil was executed; for, if we find their relations illicit at that time, then the marriage was consummated later, and the codicil and the will fall together before the statute, which executes itself and revokes them both. There was no proof in the case either of a ceremonial marriage or an actual marriage contract between these parties, and such a contract can only be implied from the facts and circumstances disclosed by

the evidence; and the presumption furnished by the licentious character of the intercourse between these parties in its commencement, supplemented by the natural and legitimate deduction from the evidence already recited, renders it impossible to infer a marriage contract between them earlier than July, 1884, after the return of Gall from Europe.   Prior to that time there was nothing in his conduct or conversation to indicate anything but the existence of concubinage between him and Amelia.   His conversations with his physician, his designation of Amelia in his codicil as a former servant of his wife, his declaration to his partner at the same time that the difference between the social position of himself and Amelia was too wide to admit of a marriage between them, are all absolutely inconsistent with the existence of a matrimonial contract between them at the time of the execution of his codicil and his departure for Europe.   The testimony of the mother of Amelia has not been overlooked, but if Gall ever had such a conversation with her in 1883, as she details, it was the language of pacification, and not of truth, and her evidence is so at war with all the conceded facts that it is entitled to no weight in the case.   There is sufficient evidence to justify the inference of a marriage contract between the parties after July, 1884, but not before that time; and our conclusion is that the marriage and birth of the last child were subsequent to the execution of the will and codicil, and that both stand revoked by virtue of the statute.   The decree of the surrogate should therefore be affirmed, with costs to be paid from the estate.

---

### UNITED STATES LIFE INS. CO. *v.* OSWEGO CANAL CO.

*(Supreme Court, General Term, Fourth Department.  July 1, 1890.)*

**1. ESTOPPEL—IN PAIS—LACHES.**

A land-owner, whose building was erected over and partially supported by stone piers placed in a canal used for hydraulic purposes, entered into a written contract with the canal company, wherein he agreed to remove the piers within a year and substitute iron columns, so as not materially to obstruct the flow of the water.  The canal company, in return, agreed that these iron columns should remain in the canal as long as the building stood.  *Held*, that the land-owner's violation of his agreement in permitting the piers to remain for several years, until they had become so dilapidated as to render his building insecure, did not justify the canal company, which had acquiesced in the delay, in its refusal to shut off the water from the canal for a sufficient time to enable the land-owner to make the alterations provided for in the agreement; the removal of the water being necessary to make the repairs.

**2. SAME.**

The fact that the water had all been drawn from the canal some months previous to the land-owner's discovery of the dilapidated condition of the piers, and that he had then failed to examine them, and repair the defect, will not justify the company's refusal to turn off the water so as to enable him to make the repairs.

**3. CONTRIBUTORY NEGLIGENCE—LOSS OF RENTS.**

The land-owner will not be permitted to recover for his inability to rent the building on account of its insecurity resulting from the defective condition of the piers, though he requested the company to turn off the water so as to enable him to make the repairs, and notified it that he would hold it responsible for loss of rents, as his own failure to comply with his agreement, and his neglect to repair the piers when he had the opportunity, contributed to his loss.

**4. EQUITY—NECESSARY PARTIES.**

The lessees of water from the canal company, who have the privilege of drawing a specific quantity of water from the canal at a fixed yearly rent, are not necessary parties to an action brought by the land-owner against the canal company to compel it to turn off the water, as they are represented by the company, which has the title to and control of the canal as a whole.

Appeal from judgment on report of referee.

Action by the United States Life Insurance Company in the city of New York against the Oswego Canal Company to compel defendant to remove the water from its canal so as to enable plaintiff to repair certain stone piers on which rested a building owned by plaintiff.   The referee reported in plaintiff's