## FAGAN *v*. FAGAN.

*(Supreme Court, General Term, First Department. July 18, 1890.)*

MARRIAGE—EVIDENCE.

The origin of the relation between plaintiff and defendant was meretricious. Though the cohabitation extended over 20 years, defendant's sister testified that at the end of that period plaintiff told her that she had not been married to defendant. To strangers, defendant spoke of plaintiff as Mrs. F., (F. being defendant's name.) He also addressed two letters to her as Mrs. F. Their companionship was restricted to their own apartments, where he seldom appeared in the day-time. Plain-

tiff was excluded from the acquaintance of defendant's relatives and friends; and defendant did not make calls or visits with her, or take her to places of amusement. *Held*, that the original relation had never changed into a matrimonial cohabitation.[1]

Appeal from judgment on report of referee.

Action by Catharine Fagan against Charles J. Fagan. From a judgment entered upon the report of a referee dismissing the complaint, plaintiff appeals.

Argued before BARTLETT and MACOMBER, JJ.

*Knevals & Ransom,* for appellant.    *McKenzie Semple,* for respondent.

BARTLETT, J.    After carefully reading the 631 type-written pages of testimony taken before the referee in this case, I am satisfied that he reached a correct conclusion in deciding that the relation of marriage never existed between the plaintiff and the defendant.    The referee, in a well-considered opinion, has discussed the facts so fully and satisfactorily that I should only have to go over the same ground with the same result if I attempted to review them in detail.    In what I have to say, therefore, I shall merely refer to some of the leading facts tending to show that there was no marriage between the parties, and then proceed to examine the principal authorities relied upon by the learned counsel for the appellant in the brief submitted in her behalf.

It is conceded that no ceremony of marriage was ever performed, by virtue of which these persons were united to one another.    The origin of the relation between them was undoubtedly meretricious.    Starting with this established fact, the proof fails to satisfy me that the relation ever became matrimonial.    It is true, the cohabitation was a long one, extending over some 20 years, and it may well be argued that such fidelity is rather to be expected from a husband towards his wife than from a man to his mistress; yet we have the testimony of one of the defendant's sisters, who does not seem uncharitably disposed towards the plaintiff, that at the end of this period of 20 years the plaintiff admitted that she had never been married to the defendant, but declared that she had been better and truer to him than a great many married women would have been.    The use of the defendant's name by the plaintiff, to the extent of calling herself Mrs. Fagan, was as necessary to the comfortable maintenance of the plaintiff in respectable quarters, if she was his mistress, as it would have been if she had been his wife.    Without it, the parties could not have cohabited at any decent abode in which other families dwelt; and too much importance, therefore, is not to be attached to the fact that the defendant thus sanctioned her use of his name.    Under these circumstances, it was quite natural that he should speak of her to strangers as Mrs. Fagan.    There is very little proof that he ever expressly referred to her as his wife.    The two letters addressed by him from Buffalo to her in New York as Mrs. C. Fagan are the most important items of evidence on this branch of the case; but it is to be observed that if he wished to communicate with her by mail it was essential to write to her under the name by which she was known at the place where she lived, whether she was in fact his wife or merely his mistress.    Taking into consideration the manner in which these people began living together; the practical exclusion of the plaintiff from the acquaintance of the defendant's relatives and friends, (an exclusion to which she seems willingly to have submitted;) the defendant's neglect to show her any of the attentions usual in married life, such as making calls or visits with her, or taking her to places of amusement; the restriction of their companionship to their own apartments, where he appears seldom to have been in the day-time; and the separation of the plaintiff from the defendant's social surroundings, and the

---

[1] See note at end of case.

occupations and interests of his daily life,—I find it impossible to say that there was any time when the original adulterous connection changed into a matrimonial cohabitation. None of the cases cited on the part of the appellant require any different conclusion from that which was reached by the referee. I will discuss these cases in the order in which they occur upon the brief.

In *Caujolle* v. *Ferrie*, 26 Barb. 177, there was evidence of an express declaration by the decedent that she had been married in the time of the Revolution; and CLERKE, J., said that there was no reason inevitably necessitating the presumption of illegal cohabitation in that particular case,—a fact which, in my opinion, materially distinguishes it from the case at bar.

In *O'Gara* v. *Eisenlohr*, 38 N. Y. 296, the question was whether Patrick Donnery was married to Rose McKone. "They frequently declared that they were married, and Donnery introduced her as his wife, and at all times during this period called her such, and so she was treated and regarded," says MASON, J. "She had in her possession a certificate of her marriage to Donnery." The differences between that case and this are too obvious to require comment.

In *Bissell* v. *Bissell*, 55 Barb. 325, there was an express agreement of marriage in the present tense, followed by cohabitation. The man placed a ring upon the woman's finger at the time of the agreement, telling her that it was her wedding ring. The parties lived together as man and wife for five weeks, and the defendant addressed the plaintiff and spoke of her as his wife. A marriage was inferred from these facts; the court saying, however, that a mere agreement to marry at a future time, followed by cohabitation, would not constitute a marriage. But the agreement proved was an agreement in the present tense by which the parties assumed and entered into the marital relation.

The case of *Hyde* v. *Hyde*, 3 Bradf. Sur. 518, lays down the well-known proposition that where the intercourse has been meretricious in its origin there must be evidence of a change in its character; but proof of a ceremonial marriage is not indispensable to establish such a change. There is no suggestion in the present case that the plaintiff might not have proved the existence of the marital relation between herself and the defendant without any evidence of a marriage ceremony. The simple contention of the respondent is that she has not established it by proof of any kind. As Surrogate BRADFORD said in the case cited: "The whole matter, in truth, resolves itself into a mere question of evidence; and if there is enough to satisfy the mind of the court that the parties recognized new relations, and held themselves out to the world as man and wife,—if they, by their conduct and declarations, professed to be bound by marital ties, and thus exhibited the continuation of their cohabitation upon a different footing from what it had been formerly,—the conclusion may be in favor of a marriage, although there was no formal ceremony or regular solemnization."

The question chiefly considered in *Rose* v. *Clark*, 8 Paige, 574, was whether the *status* of marriage existed between persons, both of whom were deceased at the time of the trial. They began living together under a contract of marriage which was absolutely void because the woman's first husband was living at the time; though the chancellor says that neither of the parties may have known that such was the fact. After the first husband died, however, they continued to live together as husband and wife, sustaining fair characters, for upwards of seven years. They joined in a deed of land, in which the woman was described as the wife of the man. From these and other circumstances it was held that the surrogate was justified in inferring the existence of a valid marriage relation between the parties, entered into subsequent to the death of the first husband. Chancellor WALWORTH, however, is careful to point out that "the presumption of marriage only arises from matrimonial

cohabitation,—where the parties not only live together as husband and wife, but hold themselves out to the world as sustaining that honorable relation;" and he refers to an interesting Scotch case, decided by the house of lords, as illustrative of the kind of cohabitation from which no inference of matrimony can be drawn, although the man did, for a particular purpose, represent the woman to be his wife. That case is *Cunninghams* v. *Cunninghams*, 2 Dow, 482, where it appeared that, after an illicit connection for some time, the parties cohabited in such a way as to create a repute of their being married, although such repute was described as being a divided one. The man, in order to secure lodgings with persons of respectability, and to protect the woman from rude treatment by a drunken companion, acknowledged her to be his wife. The court of sessions in Scotland inferred the existence of a marriage, but the house of lords reversed the judgment.

In the well-known case of *Hynes* v. *McDermott*, 91 N. Y. 451, which is the next in order of those cited by the appellant, it was shown that Mr. Hynes repeatedly spoke of the plaintiff as his wife, and that her relatives visited him on the footing of relatives by marriage. Nothing of this sort appears in the present case. Furthermore, it is worthy of note that the court of appeals thought proper to state, in so many words, that they were not called upon to say whether the finding of a marriage by the jury was satisfactory to them or not.

The decision of the old supreme court in *Fenton* v. *Reed*, 4 Johns. 52, is merely authority for the proposition that, except in prosecutions for bigamy, or actions for criminal conversation, a marriage may be proved from cohabitation, reputation, acknowledgment of the parties, reception in the family, and other circumstances. The facts in *Jackson* v. *Claw*, 18 Johns. 346, were in some respects like those in *Rose* v. *Clark*, *supra*. The original union of the parties was unlawful, the first wife of the man being then living; but their continued cohabitation for 27 years after the death of the first wife was presumptively established. Their reputation of being married persons, and their good character in society, were held sufficient to warrant the inference of an actual marriage subsequent to the presumed death of the first wife.

In *Clayton* v. *Wardell*, 4 N. Y. 230, it was shown that the parties had executed articles of separation, in which they were described as husband and wife; and yet the court refused to infer the existence of the marital relation from this fact, where the effect would have been to invalidate a subsequent ceremonial marriage of the woman with another man. The execution of such an instrument seems a much more emphatic and conclusive avowal of marriage than the sending of the two letters to the plaintiff in this suit addressed to her as Mrs. C. Fagan.

In *Cunningham* v. *Burdell*, 4 Bradf. Sur. 343, 455, the question was simply whether there had been a ceremonial marriage or not between Mrs. Cunningham and Dr. Burdell.

In *Betsinger* v. *Chapman*, 88 N. Y. 487, the cohabitation was not illicit in its origin.

There was a ceremonial marriage in *Starr* v. *Peck*, 1 Hill, 270, and it was held that a prior non-ceremonial marriage might be inferred.

And, finally, in *Badger* v. *Badger*, 88 N. Y. 547, 553, the proof was said not to warrant the conclusion that the connection was illicit at the beginning.

Enough has been said of each of these cases to show that they are all readily distinguishable from the case at bar; and, as already intimated, I think the judgment below, on the facts, should be affirmed, unless its reversal is required by the authority of adjudicated cases. As to the morality of the defendant's conduct in withdrawing all support from the woman with whom he had cohabited for 20 years, and who, so far as appears, was always faithful to him, I have no comment to make. That is a matter for his own conscience. Whatever we may think of it, the court cannot properly punish him by ad-

judging a marriage to exist where there was no marriage in fact.   For these
reasons, I am in favor of affirming this judgment.

°          NOTE.

MARRIAGE—WHAT CONSTITUTES.   In *New York*, marriage, so far as its validity in
law is concerned, is a civil contract to which the consent of parties, capable in law of
contracting, shall be essential.   2 Rev. St. p. 138, § 1, (8th Ed. p. 2595.)   No legal forms,
religious ceremonies, or special mode of proof are required, but it may be inferred
from general reputation, cohabitation, acknowledgment, and acts of recognition.   Cun-
ningham v. Burdell, 4 Bradf. Sur. 343; Tummalty v. Tummalty, 3 Bradf. Sur. 369; Grot-
gen v. Grotgen, Id. 373; In re Taylor, 9 Paige, 611; Clayton v. Wardell, 4 N. Y. 230;
Hill v. Burger, 3 Bradf. Sur. 432; In re Christie's Estate, 1 Tuck. 81; Minor v. Jones, 2
Redf. Sur. 289; People v. Bartholf, 24 Hun, 272.   Where the parties agree to be hus-
band and wife, and cohabit and recognize each other as such, there is a valid marriage.
Hayes v. People, 25 N. Y. 390.   The agreement need not be made in the presence of
witnesses.   Van Tuyl v. Van Tuyl, 8 Abb. Pr. (N. S.) 5; Fenton v. Reed, 4 Johns. 52;
Jackson v. Claw, 18 Johns. 345; Rose v. Clark, 8 Paige, 574; Jenkins v. Bisbee, 1 Edw.
Ch. 377; Hicks v. Cochran, 4 Edw. Ch. 107.   In Davis v. Davis, 7 Daly, 308, it was held
that mutual consent between competent parties is sufficient to constitute a marriage,
and cohabitation need not be shown.   A contract to marry *per verba de futuro* is not
a marriage in fact, though the parties cohabit on the faith of it.   Cheney v. Arnold,
15 N. Y. 345.   See, also, Turpin v. Public Administrator, 2 Bradf. Sur. 424.

VALIDITY—FORMER MARRIAGE.   Though the New York statute exempts from the
penalties of bigamy a married person who marries again after an absence of five years
on the part of the other spouse, such second marriage is nevertheless void, if the ab-
sent spouse was alive at the time.   Williamson v. Parisien, 1 Johns. Ch. 388.

EVIDENCE.   Though the cohabitation of the parties with their declarations that they
are married is *prima facie* evidence of a marriage, it is not conclusive.   Jackson v.
Claw, 18 Johns. 346; Clayton v. Wardell, supra.   Where a man and a woman, profess-
ing to be husband and wife, came to New York from a foreign country, and lived to-
gether for several years as husband and wife, children being born to and acknowl-
edged by them, the facts were held sufficient to prove a marriage.   Brower v. Bowers,
1 Abb. Dec. 214.   Meretricious intercourse is insufficient to raise a presumption of mar-
riage.   Rose v. Clark, 8 Paige, 574; Clayton v. Wardell, supra; Foster v. Hawley, 8 Hun,
68.   But marriage may be presumed from the continuance of a connection which was
adulterous in its inception, where there is evidence showing that the character of the
connection has changed to that of husband and wife.   Hyde v. Hyde, 3 Bradf. Sur. 509.
In Gall v. Gall, 21 N. E. Rep. 106, which was an action for dower, plaintiff's marriage
with deceased was denied, and no proof of a ceremonial marriage was offered.   The
evidence showed that plaintiff was, and had been for nine years, a servant in the fam-
ily of deceased, who was an old man.   Deceased lost his wife three years prior to his
death, and plaintiff continued to act as his cook and housekeeper, being treated only as
a servant, until, by a criminal intimacy between them, she became pregnant, and he
removed her to a house, where he supported her, and took rooms himself at an hotel
in the city.   When the child was born, he acknowledged its paternity in many ways,
and when plaintiff went to live with her mother he spent much time there, sleeping
with her, referring to her as his wife, and addressing her mother as his mother.   He
referred to her and the child as his family, and finally went to live with her alto-
gether.   To those who knew of their cohabitation he always held her out as his wife,
and she was so reputed, but to others he passed as a widower, and denied any inten-
tion of remarrying.   He told his partner that he was married to plaintiff, having
taken legal advice on the subject, and refused to have a ceremony performed on the
ground of publicity.   Before leaving deceased's residence, plaintiff disclaimed being
married to deceased.   Shortly after the birth of the first child, deceased made a codi-
cil to his will, bequeathing a legacy to plaintiff by her maiden name, and also one to
the child, giving it his own name.   Held, that a verdict finding a marriage between
them was supported by the evidence.   In Re Gall's Will, 9 N. Y. Supp. 466, upon an
issue whether a non-ceremonial marriage between decedent and A. had been consum-
mated between April 3, 1883, when the former executed his will, and April 28, 1884,
when he executed a codicil, there was evidence that in 1883 A. was a servant in de-
cedent's employ; that an illicit intercourse was then commenced between them; that
in January, 1884, decedent placed her in a tenement house in New York city, where a
child was born, while he took a suite of rooms at an hotel in the city; that during this
period, the codicil was executed, leaving a legacy to A., by her maiden name, and also
one to the child, giving it his own name; and that, during this time, decedent did not
hold her out as his wife.   There was also evidence that decedent called A.'s mother
his mother prior to the making of the codicil, and that he bought a house about the
time the codicil was executed which he said was for "his family," or "for his wife and
family."   His business partner testified that on April 24 or 25, 1884, decedent stated
to him that his social standing, and the ignorance of the girl, would not admit of his
marrying her at that time.   Held that, on April 28, 1884, the parties had not passed,
by mutual consent, from a state of illicit intercourse into that of marriage.   See, also,

10 N. Y. Supp. 661. In an action for divorce, the evidence showed that the parties were engaged to be married; that the man (defendant) objected to any ceremony, insisting that a marriage was valid without it, and the woman (plaintiff) finally acceded to his wish; that, on the day fixed for the marriage, plaintiff left her sister's house, saying that she was going to be married. She met defendant, and they got into a carriage. While in the carriage, defendant put a ring on plaintiff's finger, saying: "This is your wedding ring. * * * We are married just as much as Charles is to his wife, [referring to his brother.] I will live with you and take care of you all the days of our life." He then took her to a house where he had previously engaged board for himself and his wife. Held a valid marriage. Bissell v. Bissell, 7 Abb. Pr. (N. S.) 16. Where a man and a woman, claiming to have been married at a particular time and place, kept house, and publicly cohabited as man and wife, for 10 years, during which time children were born to them, a marriage will be presumed, though it is proved that there was no ceremonial marriage. Tummalty v. Tummalty, 3 Bradf. Sur. 369. See, also, Brinkley v. Brinkley, 50 N. Y. 184; Starr v. Peck, 1 Hill, 270. A provision in a will for a person referred to by testator as his wife is sufficient to prove a marriage between testator and the person referred to. In re Baker, 6 Dem. Sur. 271. Where a woman, indicted as a *feme sole*, pleads to the indictment, it is *prima facie* evidence that she is unmarried. Seiler v. People, 77 N. Y. 411.

STRICT PROOF—WHEN REQUIRED. Strict proof of marriage is required only in prosecutions for bigamy, and in actions for criminal conversation and divorce. Fenton v. Reed, 4 Johns. 51; Clayton v. Wardell, supra; Rockwell v. Tunnicliff, 62 Barb. 408: Dann v. Kingdom, 1 Thomp. & C. 492. See, also, Van Gelder v. Post, 2 Edw. Ch. 577; Rose v. Clark, 8 Paige, 574; Scherpf v. Szadeczky, 4 E. D. Smith, 110.

INSANITY—EFFECT OF INQUISITION. An inquisition of insanity, taken two days after marriage, which finds that the husband was then, and had been insane for six months previous thereto, is only presumptive evidence of insanity at the time of the marriage, in an action to annul it. Banker v. Banker, 63 N. Y. 409.

HEARSAY. A marriage may be proved by hearsay evidence. Chamberlain v. Chamberlain, 71 N. Y. 423.

CHURCH REGISTERS. Church registers are admissible to prove marriages. Maxwell v. Chapman, 8 Barb. 579.